### ASSOCIATION OF COMMUNICATIONS ENTERPRISES, Appellant,

v.

### FEDERAL COMMUNICATIONS COMMISSION, Appellee.

AT&T Corporation, et al., Intervenors.

No. 99–1441.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 11, 2000.

Decided Jan. 9, 2001.

Charles C. Hunter argued the cause for appellant and supporting intervenor Competitive Telecommunications Association. With him on the briefs were Catherine M. Hannan and Robert M. McDowell.

Peter D. Keisler argued the cause for intervenor AT&T Corp. With him on the brief were Mark C. Rosenblum, Roy E. Hoffinger and C. Frederick Beckner III.

John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were Christopher J. Wright, General Counsel, and Laurence N. Bourne, Counsel.

Michael K. Kellogg argued the cause for intervenor SBC Communications Inc. With him on the brief were James D. Ellis and Martin E. Grambow.

---

* Senior Judge Silberman was in regular active service at the time of oral argument.

Before: EDWARDS, Chief Judge, ROGERS, Circuit Judge, and SILBERMAN, Senior Circuit Judge.*

Opinion for the Court filed by Senior Circuit Judge SILBERMAN.

SILBERMAN, Senior Circuit Judge:

The Association of Communications Enterprises appeals from an order of the Federal Communications Commission approving the transfer of Commission licenses from Ameritech Corp. to SBC Communications Inc. in connection with the merger of the two companies. The order allows the merged company to avoid statutory resale obligations on certain advanced telecommunications services by providing those services through a subsidiary. We vacate.

### I.

As all observers of the American telecommunications system are well aware, when a 1982 consent decree dismantled the Bell monopoly over many telecommunications services, the Bell System's local exchange operations were severed from its other operations and split geographically among seven Regional Bell Operating Companies (RBOCs). Ameritech and SBC were both RBOCs and provided various states with local exchange and exchange access services, which depend critically on maintenance and operation of the "local loop," the physical infrastructure by which wire-based telephone service is provided. Because the local loop is a natural monopoly, control over it allowed the Bell System, and then RBOCs, to control telecommunications access to most homes and businesses.

Today the Telecommunications Act of 1996 governs the obligations of telecommunications carriers such as Ameritech and SBC.[1] The Act imposes on carriers certain duties intended to open telecommuni-

---

1. See Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (codified at 47 U.S.C.A. § 151 et seq. (Supp.2000)).

cations markets to competition. The Act's strictest obligations are levied on "incumbent local exchange carriers" (ILECs), which are those local exchange carriers (LECs) that were providing a given area with monopoly or near-monopoly telephone exchange service on the Act's enactment date, as well as their successor and assigns.

ILECs are subject to stringent market-opening duties. Of particular relevance to this appeal is the Act's ILEC resale obligation, 47 U.S.C. § 251(c)(4), which requires ILECs "to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." Section 251(c) also requires ILECs to negotiate in good faith, to provide interconnection with other telecommunications carriers, to provide unbundled access to network elements where technologically feasible, and to allow physical collocation of equipment necessary for interconnection or access to unbundled network elements.

For some time, various ILECs have argued that ILECs' § 251(c) resale obligations should not extend to their provision of so-called advanced services because ILECs do not exercise market power over those services. The Act defines "advanced services," regardless of transmission medium or technology, "as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graph-

ics, and video telecommunications using any technology."[2] ILECs contended before the Commission both that ILECs are not subject to § 251(c) in their provision of advanced services and that, even if § 251(c) does apply to ILEC's advanced services, the Commission should simply forbear from applying it. The Commission rejected both arguments. The Commission determined that advanced services are telecommunications services like any others and may not be provided by an ILEC unless the ILEC complies with § 251(c).[3] It also determined that it lacked authority to forbear from applying § 251(c) to advanced services. It concluded that exempting ILEC-provided advanced services from § 251(c) market-opening obligations "is at odds with the technology[-]neutral goals of the Act and with Congress' aim to encourage competition in *all* telecommunications markets." (Emphasis added).

In 1998 Ameritech and SBC proposed a stock-for-stock merger that would make Ameritech a wholly owned subsidiary of SBC. The merging companies filed a joint application requesting Commission approval to transfer control to SBC of licenses and lines owned and controlled by Ameritech. The Commission determined that this application compelled it to consider whether the merger as a whole—not just the transfer of individual lines—was consistent with the Act. Appellant Association of Communications Enterprises (ASCENT),[4] a national trade association rep-

---

**2.** Advanced services differ from most traditional telecommunications services in that they are digital, not analog. Instead of maintaining a continuous channel of communications for the entire information transfer, advanced services are usually transferred in multiple discrete bundles of digital information, called "packets," that are transmitted individually over the most efficient route available, and then reassembled instants later at their destination. This process of separate transmission and subsequent reassembly is called "packet-switching."

**3.** *See Deployment of Wireline Services Offering Advanced Telecommunications Capability,* 13 F.C.C.R. 24,012, ¶¶ 11, 66–67, 1998 WL

458500 (F.C.C. Aug. 6, 1998) (*Deployment Order*); *Deployment of Wireline Services Offering Advanced Telecommunications Capability,* 15 F.C.C.R. 385, ¶¶ 10–11, 1999 WL 1244007 (F.C.C. Dec. 23, 1999), *pet. for review filed sub nom. MCI WorldCom, Inc. v. FCC,* No. 00–1002 (D.C.Cir. filed Jan. 3, 2000); *Deployment of Wireline Services Offering Advanced Telecommunications Capability,* 14 F.C.C.R. 19,237, ¶ 3, 1999 WL 1016337 (F.C.C. Nov. 9, 1999).

**4.** During its opposition to the joint application, ASCENT was known as the Telecommunications Resellers Association. For clarity's sake we use the association's new name throughout.

resenting telecommunications providers and resellers, opposed the application. ASCENT alleged that the merger of two of the largest ILECs would hinder competition and urged that certain competition–enhancing conditions be imposed on the merged company, after which Ameritech and SBC supplemented their application to include a package of voluntary commitments.

The Commission approved the merger and permitted the new company to offer advanced services through a separate affiliate and, by doing so, avoid § 251(c)'s duties.[5] Although the Act extends an ILEC's market-opening obligations, including the requirement that an ILEC sell its telecommunications services to a reseller at wholesale prices, to an ILEC's "successor or assign," the Commission adopted a presumption that the advanced services affiliate is not such a successor or assign so long as it complies with various structural and transactional safeguards.[6] These include independent operations, separate officers, directors, employees, books, records, and accounts, and transactions with SBC/Ameritech conducted on an arm's length basis. It is important to note that although this case arises out of a merger proceeding, the Commission's order has a broader application. Any ILEC would be entitled, according to the Commission's logic, to set up a similar affiliate and thereby avoid § 251(c)'s resale obligations.

## II.

Appellant's primary argument is that the Commission's order is simply a device to accomplish indirectly what the statute clearly forbids: the Commission's exercise of forbearance authority over an ILEC's provision of advanced services. Under the order ILECs can circumvent § 251(c)'s re-quirement that they offer advanced services at wholesale prices by merely creating a subsidiary—albeit a subsidiary that must operate somewhat separately from the ILEC. And according to appellant, Congress manifested a clear intent that the Commission not forbear from regulating any ILEC's telecommunications services, including advanced services, unless certain market conditions are met. Intervenor AT&T trains its fire on the Commission's interpretation of the phrase "successor or assign," claiming that its construction of those terms is inconsistent with a number of cases in which those terms are defined as used in other statutes. The Commission insists that it is not actually utilizing its forbearance authority and that the phrase "successor or assign" is sufficiently ambiguous so that under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we are obliged to defer to the Commission's interpretation. As should be obvious, these arguments are quite interrelated. For even if we conclude that the Commission has not formally used its forbearance authority and that the phrase "successor or assign" is ambiguous, the meaning of the statute, as revealed by its structure, may render the Commission's "successor or assign" construction unreasonable.

Section 10 of the Act provides in relevant part:

... [T]he Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic

**5.** *See Applications of Ameritech Corp. and SBC Communications Inc.,* 14 F.C.C.R. 14,712, ¶ 349, 1999 WL 1337659 (F.C.C. Oct. 6, 1999) (*Merger Order*).

**6.** The *Merger Order* provides that if a court determines that the affiliate *is* a successor or assign under the specified conditions, then the new company's obligation to provide advanced services only through an affiliate would terminate.

markets, if the Commission determines that—

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

47 U.S.C. § 160(a). But the Commission "may not forbear from applying the requirements of section 251(c) ... until it determines that those requirements have been fully implemented." 47 U.S.C. § 160(d). Because those requirements have not been fully implemented here, the FCC (as it concedes) may not forbear.[7]

Appellant argues that the Merger Order is "the legal and practical equivalent" of forbearance. In other words, to apply § 251(c) as narrowly as the Commission has done is akin to forbearing from regulating. The Commission insists that it is not actually "forbearing" but rather interpreting § 251(c) not to apply to this affiliate structure. In other words, the definition of ILEC in § 251(h) does not explicitly mention affiliates, so the Commission claims authority to determine case by case whether a particular affiliate is an incumbent LEC or not. When it does so it is interpreting the statute rather than determining whether to forbear.

We think appellant's argument is a powerful one. Although the Commission has

not explicitly invoked forbearance authority (in direct violation of § 10), to allow an ILEC to sideslip § 251(c)'s requirements by simply offering telecommunications services through a wholly owned affiliate seems to us a circumvention of the statutory scheme. The Commission justifies its order by drawing our focus to its definition of "successor and assign." The Commission reasons that the affiliate structure it approved would be illegal only if it were obliged to treat an affiliate as a successor and assign of an ILEC, because only under these circumstances would § 251(c)'s requirements carry over to the affiliate. And since "successors and assigns" is not defined in the Act, the Commission's definition is entitled to *Chevron* deference.

The Commission's approach gives rise to a fierce argument, mounted particularly by intervenor AT&T, that the Commission's definition of successor and assign is impermissible. AT&T draws particularly on NLRB cases to claim that the affiliate must be thought a successor or assign. *See, e.g., Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *NLRB v. New Madrid Mfg. Co.*, 215 F.2d 908, 911 (8th Cir.1954). AT&T emphasizes that the affiliate markets the same category of services to the same body of potential customers as did SBC/Ameritech. The Commission decided the affiliate was not a successor or assign essentially because the company did not transfer its "traditional business operations"—its monopoly assets. Thus, the Commission has permitted, through the technique of defining successor and assign to exclude the transfer of advanced services to an affiliate, the very result it had previously rejected—

---

7. Section 706 of the Act provides in relevant part that "[t]he Commission ... shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans ... by utilizing, in a manner consistent with the public interest, convenience, and necessity, ... regulatory forbearance." 47 U.S.C.A. § 157 note. Am-

eritech and SBC argued that § 706 is an independent grant of authority to forbear, but the Commission concluded that § 706 was only an instruction that the Commission should utilize § 10's forbearance authority in the context of advanced services. *See Deployment Order* ¶ ¶ 68–69.

allowing an incumbent LEC to avoid the resale obligation on its advanced services.

Paradoxically the Commission is using language designed by Congress as an added limitation on an ILEC's ability to offer telecommunications services as a statutory device to *ameliorate* § 251(c)'s restriction. We do not think that in the absence of the successor and assign limitation an ILEC would be permitted to circumvent § 251(c)'s obligations merely by setting up an affiliate to offer telecommunications services. The Commission is thus using the successor and assign *limitation* as a form of legal jujitsu to justify its *relaxation* of § 251(c)'s restrictions.

That an ILEC would not be permitted to avoid the limitations on telecommunications services—including advanced services—through a wholly owned affiliate, even in the absence of the "successor or assign" restriction, is evident by examination of the very provision on which the Commission relies to justify the affiliate structure in this case. The Commission looks to 47 U.S.C. § 272, which allows ILECs to provide certain maintenance and long-distance services—but not advanced services—through a separate affiliate. As set out in the Merger Order, the advanced services affiliate must "operate largely in accordance with the structural, transactional, and nondiscrimination requirements of [47 U.S.C.§] 272(b), (c), (e), and (g)." Merger Order ¶ 364.

But § 272 applies *only* to manufacturing activities, telecommunications services between different local access and transport areas (LATAs), and interLATA information services—not advanced services. *See* 47 U.S.C. § 272(a)(2). It sets out a series of formal structural and transactional obligations intended to check LECs' incentive to leverage their bottleneck assets into market power over other telecommunications services. LECs can provide the services covered by § 272 only through a separate affiliate, which must "operate independently" of its LEC; maintain separate books, records, and accounts; have separate officers, directors, and employees; and conduct all transactions with its parent LEC "on an arm's length basis . . . reduced to writing and available for public inspection." *Id.* § 272(b)(1)-(3), (5). The LEC is prohibited from discriminating between its § 272 affiliate and other entities "in the provision or procurement of goods, services, facilities, and information, or in the establishment of standards." *Id.* § 272(c)(1).

To be sure, obligations substantially similar to these bind the new company and its advanced services affiliate by force of the Merger Order. *See* Merger Order ¶ 364.[8] But § 272 is not only an inapt analogy, it actually undermines the Commission's position. As intervenor AT&T points out, § 272 affiliates are established primarily to provide interLATA telephone service, which an ILEC is generally barred from providing. *See* 47 U.S.C. § 271. Since the ILEC may not provide this service in the first place, the § 272 affiliate obviously does not succeed to an existing interLATA telephone service business or to the assets the ILEC used to provide that service. This point alone would render the § 272 comparison inapposite for advanced services, which were previously provided by the merged companies, *see* Merger Order ¶ 475. Yet the § 272 comparison is even more damning than that, for § 272 evidences Congress' considered judgment as to when an ILEC may legally provide telecommunications services through an af-

---

**8.** While the advanced services affiliate must be separate from the merged company as a matter of corporate form, its separation does not extend to various other matters, including some that constitute deviations from the provisions of § 272. The *Merger Order* provides for certain joint services, including joint marketing and performance of certain customer care services. Certain operation, installation and maintenance functions of the affiliate may be performed by the merged company, and the affiliate may use the merged company's "name, trademarks, and service marks on an exclusive basis." *Merger Order* ¶ ¶ 364–65.

filiate and thereby avoid some of the Act's strictures. Since Congress prescribed no such affiliate structure for advanced services, we must assume that Congress did not intend for § 251(c)'s obligations to be avoided by the use of such an affiliate.

Congress thus has specified when conditions justify allowing an ILEC to provide telecommunications services without § 251(c)'s duties. And it has specified when an ILEC may avoid the Act's burdens by providing telecommunications services through a separate affiliate, and what services that affiliate may provide. In short, the Act's structure renders implausible the notion that a wholly owned affiliate providing telecommunications services with equipment originally owned by its ILEC parent, to customers previously served by its ILEC parent, marketed under the name of its ILEC parent, should be presumed to be exempted from the duties of that ILEC parent.[9]

That is not to say that the Commission would not be entitled to some running room in defining the terms successor and assign. For instance if an ILEC sold its advanced service to an unaffiliated company the Commission might well be entitled to conclude that the new company was not a successor and assign.

The real explanation for the Commission's rather tortured statutory interpretation in this case is set forth powerfully in intervenor SBC's brief. It is argued that the Commission's order is justified because the clear purpose of the Telecommunications Act—particularly the requirements of § 251(c)—is to prevent an ILEC from abusing its market power over the local loop to prevent competition. If an ILEC has no market power over advanced services, an affiliate structure to offer those services should be permitted by concluding it is not a successor or assign so long as the affiliate is sufficiently separate. Of course, if intervenor's economic analysis is correct it is not apparent why a separate affiliate would be necessary—or even useful. It could be thought that the affiliate structure is a *non sequitur* if an ILEC cannot use its local loop monopoly to leverage its position in the advanced service market.

But whether or not SBC's premise is economically sound, it is unfortunately not Congress' premise. As the Commission concedes, Congress did not treat advanced services differently from other telecommunications services. *See* Deployment Order ¶ 11. It did not limit the regulation of telecommunications services to those services that rely on the local loop. For that reason the Commission may not permit an ILEC to avoid § 251(c) obligations as applied to advanced services by setting up a wholly owned affiliate to offer those services. Whether one concludes that the Commission has actually forborne or whether its interpretation of "successor or assign" is unreasonable, the conclusion is the same: The Commission's interpretation of the Act's structure is unreasonable.

\* \* \* \*

The order of the Federal Communications Commission is vacated in part.

*So ordered.*

---

**9.** The Commission said that an affiliate can be a successor or assign, *see Deployment Order* ¶ 90, but that this affiliate was neither. The Commission could just as well have deter-mined that the affiliate was itself a part of the ILEC and thus did not trigger the "successor or assign" inquiry.