764 N.E.2d 734 (2002)
INDIANA BELL TELEPHONE COMPANY, INCORPORATED d/b/a Ameritech Indiana, Ameritech Advanced Data Services of Indiana, Inc. d/b/a SBC Advanced Solutions, Inc. and Ameritech Interactive Media Services, Inc., Appellants,
v.
INDIANA UTILITY REGULATORY COMMISSION, et al, Appellees.
No. 93A02-0107-EX-491.
Court of Appeals of Indiana.
March 12, 2002.
Rehearing Denied May 2, 2002.
*735 Peter J. Rusthoven, Teresa E. Morton, Michael R. Fruehwald, Barnes & Thornburg, *736 Bonnie K. Simmons, Ameritech Indiana, Indianapolis, IN, Attorneys for Appellant Indiana Bell Telephone Co.
Randolph L. Seger, Steven D. Hardin, David T. McGimpsey, McHale, Cook & Welch, P.C., Indianapolis, IN, Attorneys for Appellant Ameritech Advanced Data Services of Indiana, Inc.
Steve Carter, Attorney General of Indiana, Jodi Kathryn Stein, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

OPINION
DARDEN, Judge.

STATEMENT OF THE CASE
Indiana Bell Telephone Company, Inc. d/b/a Ameritech Indiana ("Ameritech"), Ameritech Advanced Data Services, Inc. d/b/a SBC Advanced Solutions, Inc. ("AADS"), and Ameritech Interactive Media Services, Inc. ("AIMS"), appeal the Indiana Utility Regulatory Commission's ("IURC") finding that testing of Ameritech's operating support system ("OSS") should be expanded to include testing of its digital subscriber lines ("DSL") offered for resale.[1]
We affirm.

ISSUES
1. Whether the IURC erroneously upheld the Administrative Law Judge's ("ALJ") decision.
2. Whether AADS's due process rights were violated.

FACTS
SBC Communications, Inc. ("SBC") was one of the seven original regional Bell Operating Companies ("BOC") created by the monopoly breakup of AT & T; it serves as the primary incumbent local exchange carrier ("ILEC") for Arkansas, Kansas, Missouri, Oklahoma, and Texas.[2] Ameritech was also one of the original BOCs; it serves as the ILEC for Illinois, Indiana, Michigan, Ohio, and Wisconsin. Several years ago, SBC and Ameritech entered into merger negotiations. On October 6, 1999, the FCC approved SBC and Ameritech's stock-for-stock merger in which Ameritech became SBC's wholly owned subsidiary. To ensure the size of the new corporation would not stifle competition, the FCC's merger order mandated that certain conditions be met. One of the conditions required that the offering of DSL services be done through a separate affiliate. AADS was created as an Ameritech affiliate providing DSL service to *737 AIMS, an Internet service provider ("ISP") and also an Ameritech affiliate.
On February 2, 2000, Ameritech, pursuant to the Telecommunications Act of 1996 ("the Act"), filed a petition with the IURC seeking its opinion as to whether Ameritech could enter the long distance telephone market within Indiana.[3] The Act provides that Ameritech must be in compliance with a 14 point checklist before seeking approval from the Federal Communications Commission ("FCC"). Prior to a determination, the FCC must consult with the IURC to determine whether Ameritech is in compliance with the checklist.[4] The point on the checklist at issue here is whether Ameritech's telecommunications services are available for resale in accordance with the Act. In its petition, Ameritech has asked the IURC to review the results of an independent third-party test of its OSS to determine if Ameritech is in compliance with the checklist.
On March 19, 2001, the ALJ outlined a scheme for informal and formal expedited dispute resolution to resolve any issues that might arise during the review of Ameritech's petition. On May 30, 2001, certain competing local exchange carriers ("CLECs") filed a petition seeking informal dispute resolution to resolve certain testing issues.[5] Specifically, the CLECs believed that in order to determine whether Ameritech's telecommunications services were available for resale at wholesale prices to them, the independent OSS testing should include Ameritech's DSL services.[6] On June 4, 2001, Ameritech filed its response to the CLECs' petition. Ameritech argued that its DSL Internet access service was not within the scope of the checklist because DSL is an information service and not a telecommunications service.[7] Further, while Ameritech concedes that some of its DSL services are sold to large business customers and are subject to the Act's resale requirement, they should not be included in OSS testing because they are not sold in Indiana and are of a unique nature. In addition, the remaining DSL services are not sold to retail end-users, but at wholesale to ISPs.
On June 12, 2001, the ALJ granted the CLECs' petition to expand the scope of *738 OSS testing to "include a test of Ameritech's DSL resale offerings, and ... add additional DSL/resale performance measurements to assure that Ameritech's DSL resale performance can be tracked and tested." (App.4). On June 15, 2001, Ameritech filed its notice with the IURC seeking review and reversal of the ALJ's decision.
On June 27, 2001, the IURC issued its decision addressing the following issues: "(1) whether KPMG's test of Ameritech's OSS should evaluate Ameritech's provision of resold DSL services; and (2) if so, what performance measurements should be used." (App.4). The IURC found that testing of Ameritech's resale of DSL services to out-of-state large businesses would be impractical and unnecessary. However, the IURC found that the FCC could not allow an ILEC to avoid its resale "obligations as applied to advanced services by setting up a wholly owned affiliate to offer those services." (App.8). Therefore, the IURC concluded that the scope of the OSS test should be expanded to include a test of Ameritech's DSL resale offerings and that the parties should collaborate on the development of performance measurements.
On July 7, 2001, AADS filed its petition to intervene and joined Ameritech and AIMS in filing a Joint Notice of Appeal From Administrative Agency.

DECISION
1. OSS Testing
Ameritech appeals the IURC decision to expand the scope of the OSS test to include its DSL offerings at retail. Specifically, Ameritech argues that the IURC's order is contrary to law because the DSL service provided by AADS is an unregulated information service offered at wholesale to ISPs. Therefore, it is not a telecommunications service offered at retail as contemplated by the Act.
In reviewing the IURC's order, we employ a two-tiered standard of review. "`First, we determine whether the decision is supported by specific findings of fact and by sufficient evidence. Second, we consider whether the decision is contrary to law. A decision is contrary to law when the Commission fails to stay within its jurisdiction and to abide by the statutory and legal principles which guide it.'" United Rural Elec. v. Indiana Michigan Power, 716 N.E.2d 1007, 1012 (Ind.Ct.App. 1999) (quoting Knox County Rural Elec. Membership Corp. v. PSI Energy, Inc., 663 N.E.2d 182, 189 (Ind.Ct.App.1996), trans. denied.).
In 1996, Congress amended the Communications Act of 1934 with the passage of the Telecommunications Act of 1996 which is codified as amended in scattered sections of title 47, United States Code. The purpose of the Act "was to replace telecommunications monopolies and regulation with competitive markets:
[The Act] promotes competition and reduces regulation in order to secure lower prices and higher quality services for American telecommunications consumers.... [The Act] opens all communications services to competition. The result will be lower prices to consumers and businesses, greater choice of services, more innovation, and less regulation. Indeed, the enormous benefits to American businesses and consumers from lifting the shackles of monopoly regulation will almost certainly earn the... Act ... the distinction of being the most deregulatory bill in history."
Bell Atlantic-New Jersey, Inc. v. Tate, 962 F.Supp. 608, 612 (D.N.J.1997) (emphasis added) (quoting H.R.Rep. No. 204, 104th Cong., 2nd Sess., 47-48, reprinted in 1996 U.S.C.C.A.N. 10-11.).
*739 To this end, Congress prohibited, with certain exceptions, the ILECs or any affiliate from providing interLATA service. 47 U.S.C. § 271(a). However, an ILEC may submit an application to the FCC to provide interLATA services within a given state. 47 U.S.C. § 271(b). Within ninety (90) days after receiving the application, the FCC must make a determination approving or denying the application. 47 U.S.C. § 271(d)(3). However, no application can be approved unless the ILEC is in compliance with a 14 point checklist. 47 U.S.C. § 271(d)(3)(A)(i). Further, the FCC shall consult with the state utility commission to verify the ILEC's compliance with the 14 point checklist before making a determination regarding the application. 47 U.S.C. § 271(d)(2)(B).
The checklist's fourteenth point requires that an ILEC's telecommunications services be available for resale in accordance with the requirements of sections 251(c)(4) and 252(d)(3). Section 251(c)(4) imposes a duty on ILECs "to sell to any competing carrier at wholesale rates, for resale by the competing carrier to its customers, any `telecommunications service' that the incumbent provides to its own customers." MCI Telecommunications v. Sprint Florida, 139 F.Supp.2d 1342 (N.D.Fla.2001) (quoting 47 U.S.C. § 251(c)(4)(A)). This duty applies to affiliates providing advanced services such as DSL to end-users. Association of Communications Enter. v. F.C.C., 235 F.3d 662 (D.C.Cir.2001) (referred to as ASCENT I). However, the discount-for-resale provision does not apply when an ILEC offers DSL service to an ISP. Association of Communications Enter. v. F.C.C., 253 F.3d 29 (D.C.Cir.2001) (referred to as ASCENT II). The FCC has reasoned that the ILEC's offering of DSL to ISPs is not "at retail" because the "ISP packages and ultimately resells the service to end users." Id. at 30. Finally, section 252(d)(3) requires the state utility commissions to establish the wholesale rates for telecommunications service charged to competing carriers.
In this case, we find that the IURC's order is not contrary to law. While we find Ameritech's argument compelling, it calls for an interpretation of the Act that is contrary to Congress's intent that all telecommunications markets be open to competition. When examining the appropriateness of an agency's action, "we first ask whether Congress has `directly spoken to the precise question at issue.' If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." National Credit Union Admin. v. First National Bank, 522 U.S. 479, 500, 118 S.Ct. 927, 938, 140 L.Ed.2d 1 (1998) (quoting Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)); see also BAPAC v. Baldwin, 714 N.E.2d 135 (Ind.1999) ("... [W]hen a statute is unambiguous, a court must apply the plain and obvious meaning and not resort to other rules of construction.").
It is undisputed that AADS is Ameritech's affiliate offering DSL service to ISPs. However, one of those ISPs is another Ameritech affiliate, AIMS. While ASCENT II holds that the discount-for-resale provision of § 251(c)(4) does not apply to an ILEC's offering of DSL service to an ISP, it did not address whether one of those ISPs could be an affiliate of the same ILEC. The purpose of the Act was to ensure that ILECs do not use their control over local exchanges to squeeze out competitors. Bell Atlantic, 962 F.Supp. 608. Here, Ameritech controls the local exchange, its affiliate (AADS) then provides *740 DSL services to another affiliate (AIMS), which sells DSL service to the consuming public. As a result, the possibility of anticompetitive pricing for DSL services is very real. We do not imply any sinister intent on the part of Ameritech, but arguing that Ameritech can (1) make its local exchange available to its affiliate, AADS; (2) provide DSL service through AADS to ISPs, including its other affiliate, AIMS; and (3) avoid testing of its OSS to determine compliance with the checklist, is plainly contrary to Congress's intent to establish competition in the telecommunications industry.[8] Therefore, we find no error in the IURC's order.
2. Due Process
AADS argues that it was a non-party and the IURC's order should be vacated because it does not have jurisdiction over non-parties. Further, AADS argues that its due process rights under the Indiana and Federal Constitution were violated because it did not have notice of the proposed order and was not offered an opportunity to be heard.
We first consider AADS's jurisdictional argument. The record reveals that, Ameritech, pursuant to the Act, filed its petition with the IURC with hopes that the FCC will eventually permit Ameritech to offer in-region interLATA telecommunications services. As we have mentioned, the FCC must consult the IURC before making this determination. 47 U.S.C. § 271(d)(2)(B). Because AADS is an affiliate of Ameritech providing telecommunications services and Ameritech's petition involves the offering of interLATA telecommunications services, it follows that the IURC might issue a resulting order concerning AADS. Therefore, it is unclear to us how the IURC lacks jurisdiction.
We now consider AADS's due process argument. Both the Indiana and Federal Constitutions prohibit state action which deprives a person of life, liberty, or property without the "course of law" or "process" given through a fair proceeding. Lake of the Woods v. Ralston, 748 N.E.2d 396 (Ind.Ct.App.2001). "Thus, one claiming a violation of due process must show (1) that there was state action, i.e. a governmental involvement in the alleged deprivation and (2) that the state action resulted in the deprivation of a protected interest." Id. at 400. Here, AADS makes the unsupported assertion that the IURC has ordered it "to create, implement and oversee testing programs that are complex, costly and burdensome." AADS's Brief at 5. However, (1) the record reveals no evidence that such a requirement has been imposed; and (2) AADS cites no authority for the proposition that such a requirement constitutes an unconstitutional deprivation of a protected interest.
Affirmed.
SHARPNACK, J., and BAILEY, J., concur.
NOTES
[1] "Packet-switching and [DSL] make it possible to send data at high speed over conventional copper wire. Two DSL modems are attached to a telephone loop, one at the subscriber's premises and one at the telephone company's central office. If the line carries both ordinary telephone service and high-speed data transmission, the carrier must separate these streams at the company's central office, using a digital subscriber line access multiplexer. With this device, the carrier sends ordinary voice calls to the public, circuit-switched telephone network (which keeps a phone line open during a voice call) and sends data traffic to a packet-switched data network (which compresses data and can send it in split-second bursts during gaps on a line), where it can then be routed to a corporate local area network or internet service provider (`ISP')." WorldCom, Inc. v. F.C.C., 246 F.3d 690, 692 (D.C.Cir.2001).
[2] A local exchange carrier "means any person that is engaged in the provision of telephone exchange service or exchange access." 47 U.S.C. § 153(26). Incumbent local exchange carriers "are those local exchange carriers that were providing a given area with monopoly or near-monopoly telephone exchange service on the [Telecommunications Act of 1996's] enactment date, as well as their successor and assigns." Association of Communications Enter. v. F.C.C., 235 F.3d 662, 664 (D.C.Cir.2001)
[3] The Act refers to this as interLATA telecommunications services. A LATA is the geographic area within which ILECs can provide telephone service; calls within a LATA are referred to as intraLATA calls they include local calls and toll calls covering a distance beyond local calls. However, ILECs cannot provide long distance telephone or interLATA service that originates and travels beyond their assigned geographic areas without FCC approval. Bell Atlantic-New Jersey, Inc. v. Tate, 962 F.Supp. 608 (D.N.J.1997).
[4] Ind.Code § 8-1-1-2 "provides for the creation of the IURC whose purpose is to ensure that public utilities provide constant, reliable and efficient service to its customers." Prior v. GTE North Inc., 681 N.E.2d 768, 774 (Ind. Ct.App.1997).
[5] The CLECs who joined the petition were the Association of Communication Enterprises ("ASCENT"), AT & T Communications of Indiana, GP, TCG Indianapolis, the Competitive Telecommunications Association ("Comp-Tel"), McLeodUSA, Time Warner Telecom of Indiana, L.P., WorldCom, Inc., and Z Tel.
[6] "The term `telecommunications service' means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(46).
[7] "The term `information service' means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(20).
[8] We are mindful of the broadband deregulation vote scheduled to take place in the House of Representatives on H.R. 1542, the Tauzin Dingell bill. Passage of this legislation would likely render this appeal moot. However, it is not now the law. For a discussion of the debate surrounding deregulation of broadband or DSL See David McGuire, Bells, Rivals Gear Up for Battle, WASH. POST, Feb. 28, 2001, available at http://www.washtech.com/news/telecom/7915 1.html.