**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NEW EDGE NETWORK, INC., dba
New Edge Networks; ONEEIGHTY
COMMUNICATIONS, INC.; PAC-WEST
TELECOMM, INC.,
                              *Petitioners,*

COMPTEL/ASCENT,
                    *Intervenor-Petitioner,*

                v.                                No. 04-73800

FEDERAL COMMUNICATIONS                            FCC Nos.
COMMISSION,                                        04-164
                              *Respondent,*        01-138

AT&T CORPORATION; BELLSOUTH
CORPORATION AND BELLSOUTH
TELECOMMUNICATIONS, INC.,
                *Applicants-Intervenors.*

XSPEDIUS COMMUNICATIONS, LLC,
                              *Petitioner,*        No. 04-74401

                v.                                 FCC No.
                                                    04-164
FEDERAL COMMUNICATIONS
COMMISSION,
                              *Respondent.*

10409

KMC TELECOM HOLDINGS, INC.,
                    *Petitioner,*

         v.

FEDERAL COMMUNICATIONS
COMMISSION,
                    *Respondent.*

No. 04-74408

FCC No.
04-164


SNIP LINK, LCC,
                    *Petitioner,*

         v.

FEDERAL COMMUNICATIONS
COMMISSION,
                    *Respondent.*

No. 04-74410

FCC No.
04-164


COX COMMUNICATIONS, INC.;
COMPTEL/ASCENT,
                    *Petitioners,*

         v.

FEDERAL COMMUNICATIONS
COMMISSION,
                    *Respondent.*

No. 04-74720

FCC No.
04-164

XO COMMUNICATIONS INC.,
                    *Petitioner-Appellant,*

          v.                                    No. 04-74724

FEDERAL COMMUNICATIONS                          FCC No.
COMMISSION,                                      04-164
                    *Respondent-Appellee.*

COX COMMUNICATIONS, INC.,
                          *Petitioner,*         No. 04-75445

          v.                                    FCC No.

FEDERAL COMMUNICATIONS                          04-164
COMMISSION,
                          *Respondent.*

ONFIBER COMMUNICATIONS
COMMISSION,
                          *Petitioner,*         No. 04-76136

          v.                                    FCC No.
                                                04-164
FEDERAL COMMUNICATIONS
COMMISSION,                                     OPINION
                          *Respondent.*

On Petition for Review of an Order of the
Federal Communications Commission

Argued and Submitted
June 12, 2006—San Francisco, California

Filed August 29, 2006

Before: Pamela Ann Rymer, Thomas G. Nelson, and
William A. Fletcher, Circuit Judges.

Opinion by Judge Thomas G. Nelson

**COUNSEL**

Russell M. Blau, Swidler Berlin Shereff Friedman, LLP, Washington, D.C., for petitioner New Edge Network, Inc.

Stephanie Joyce, Kelley Drye & Warren LLP, Washington, D.C., for petitioners CompTel/ASCENT Alliance, KMC Telecom Holdings, Inc., OnFiber Communications, Inc., SniP LiNK, LLC, XO Communications, Inc., and Xspedius Communications, LLC.

David E. Mills, Dow, Lohnes & Albertson, PLLC, Washington, D.C., for petitioner Cox Communications, Inc.

James M. Carr, Counsel, and Austin C. Schlick, Acting General Counsel, Washington, D.C., for the respondents .

Collin S. Stretch, Kellogg, Huber, Hansen, Todd, Evans, & Figel, P.L.L.C., Washington, D.C., for the intervenors.

**OPINION**

T. G. NELSON, Circuit Judge:

## I.    Introduction

These petitions arise from the Federal Communications Commission's ("FCC") report and order changing its interpretation of a provision of the Telecommunications Act of 1996, Pub. L. 104-104, 110 Stat. 56. In 2004, the FCC adopted a new rule replacing its so-called "pick-and-choose" interpretation of 47 U.S.C. § 252(i) with an "all-or-nothing" interpreta-

tion. Petitioners in various circuits challenged the new rule, and the Judicial Panel on Multidistrict Litigation consolidated the petitions in this court.[1] We have jurisdiction pursuant to 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). We conclude that § 252(i) is ambiguous and that the FCC's all-or-nothing interpretation is reasonable. We also conclude that the FCC did not abuse its discretion by adopting the new rule. Accordingly, we deny the petitions for review.

## II.   Background

In passing the Telecommunications Act of 1996, Congress fundamentally restructured local telephone markets to promote competition.[2] States can "no longer enforce laws that impede competition," and incumbent local exchange carriers ("ILECs"),[3] which had been state-sanctioned monopolies, are "subject to a host of duties intended to facilitate market entry."[4] ILECs must make their networks available to new entrants to the market, referred to as competitive local exchange carriers ("CLECs"). ILECs must also attempt in good faith to negotiate interconnection agreements with the CLECs.[5]

Title 47 U.S.C. § 252 provides procedures for negotiation, arbitration, and approval of interconnection agreements between ILECs and CLECs. Section 252(i) provides:

> A local exchange carrier shall make available any interconnection, service, or network element[6 ] pro-

---

[1]*See* 28 U.S.C. § 2112(a)(3).

[2]*See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999).

[3]ILECs typically own "the local loops (wires connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network." *AT&T*, 525 U.S. at 371.

[4]*Id.*

[5]*See id.*; 47 U.S.C. § 251(c)(1).

[6]Section 252(i) refers to three different items ILECs must make available: (1) interconnections, (2) services, and (3) network elements. This

vided under an agreement approved under this sec-
tion to which it is a party to any other requesting
telecommunications carrier upon the same terms and
conditions as those provided in the agreement.

The meaning of this provision lies at the heart of this dispute.

A.   Pick-and-Choose

In August 1996, the FCC first interpreted § 252(i), adopting
the pick-and-choose rule.[7] Under pick-and-choose, a request-
ing CLEC could adopt individual provisions from any
approved interconnection agreement to which the ILEC was
already a party.[8]

CLECs' ability to pick and choose individual provisions
from existing interconnection agreements was not unre-
stricted. ILECs were only required to make individual provi-
sions of an agreement available to CLECs "for a reasonable

means a CLEC "can obtain access to an [ILEC]'s network in three ways:
It can purchase local telephone *services* at wholesale rates for resale to end
users; it can lease *elements* of the [ILEC]'s *network* 'on an unbundled
basis'; and it can *interconnect* its own facilities with the incumbent's net-
work." *AT&T*, 525 U.S. at 371 (emphases added).

[7]*See In re Implementation of the Local Competition Provisions in the
Telecomms. Act of 1996*, First Report and Order, 11 F.C.C.R. 15499
(1996) ("Local Competition Order"), codified at 47 C.F.R. § 51.809
(1996) (replaced in 2004 by all-or-nothing).

[8]Former 47 C.F.R. § 51.809(a) (emphasis added) provided, in part: "An
incumbent LEC shall make available without unreasonable delay to any
requesting telecommunications carrier any individual interconnection, ser-
vice, or network element *arrangement contained in any agreement* to
which it is a party that is approved by a state commission pursuant to sec-
tion 252 of the Act, upon the same rates, terms, and conditions as those
provided in the agreement." "In practical terms, this mean[t] that a [CLEC
could] obtain access to individual elements such as unbundled loops at the
same rates, terms, and conditions as contained in any approved agree-
ment." Local Competition Order ¶ 1314.

period of time," and ILECs could avoid the rule where hardship would result.[9] In addition, ILECs could require a requesting CLEC to agree to terms and conditions that were "legitimately related" to the service or element requested.[10]

Soon after the FCC released the Local Competition Order, many ILECs and some state utility commissions filed petitions challenging various aspects of the order; these cases were consolidated in the Eighth Circuit.[11] The petitioners argued, among other things, that the pick-and-choose rule was an unreasonable interpretation of § 252(i).[12] The Eighth Circuit agreed with the petitioners, held that the text of § 252(i) was ambiguous,[13] and concluded that pick-and-choose was an

---

[9]*See* 47 C.F.R. § 51.809 (1996).

[10]*See* Local Competition Order ¶ 1315 ("[W]e conclude that the 'same terms and conditions' that an incumbent LEC may insist upon shall relate solely to the individual interconnection, service, or element being requested under section 252(i). For instance, where an incumbent LEC and a new entrant have agreed upon a rate contained in a five-year agreement, section 252(i) does not necessarily entitle a third party to receive the same rate for a three-year commitment. Similarly, that one carrier has negotiated a volume discount on loops does not automatically entitle a third party to obtain the same rate for a smaller amount of loops. . . . [W]e require incumbent LECs seeking to require a third party agree to certain terms and conditions to exercise its rights under section 252(i) to prove to the state commission that the terms and conditions were *legitimately related* to the purchase of the individual element being sought.") (emphasis added).

[11]*See Iowa Utils. Bd. v. FCC*, 120 F.3d 753, 792 (8th Cir. 1997) (as amended), *rev'd sub nom. AT&T Corp.*, 525 U.S. 366.

[12]*See id.* at 800.

[13]*See id.* at 800 & n.22 (acknowledging that § 252(i) could be read to support pick-and-choose, but observing that the words of § 252(i) "do not foreclose the possibility that an entrant's selection of an individual provision of a prior agreement would require it to accept the terms of the entire agreement. In this context, the . . . words ['any interconnection, service, or network element'] could simply indicate that an incumbent LEC would not be able to shield an individual aspect of a prior agreement from the reach of a subsequent entrant who is willing to accept the terms of the entire agreement").

unreasonable interpretation.[14]

The Supreme Court reversed. The Court held that the FCC's interpretation was not only "reasonable" but "the most readily apparent." It also observed that whether pick-and-choose would in practice impede or promote voluntary negotiations between ILECs and CLECs was a matter eminently within the FCC's expertise.[15]

## B.   All-or-Nothing

After using pick-and-choose for seven years, the FCC decided to revisit the rule. In 2003, it sought "comment on whether the Commission should alter its interpretation of section 252(i) to promote more meaningful commercial negotiations."[16] In response, many CLECs, some state utility commissions, and a consumer advocacy association submitted statements in favor of pick-and-choose. ILECs, other state utility commissions, and two CLECs submitted statements in favor of eliminating pick-and-choose.

On July 13, 2004, the FCC adopted the new all-or-nothing rule.[17] Under all-or-nothing, if a requesting CLEC is interested in a service or network element provided by an ILEC, it may

---

[14]*See id.* at 801. The court reasoned that the Act demonstrates "the Congress's preference for voluntarily negotiated interconnection agreements between incumbent LECs and their competitors over arbitrated agreements," and pick-and-choose was unreasonable because it "would thwart the negotiation process and preclude the attainment of binding negotiated agreements." *Id.*

[15]*See AT&T Corp.*, 525 U.S. at 396.

[16]*See In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking ¶ 713, 18 F.C.C.R. 16978 (2003).

[17]*See In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers,* Second Report and Order, 19 F.C.C.R. 13494 (2004) ("Second Report and Order").

adopt *in its entirety* any approved agreement that includes that service or element to which the ILEC is already a party.[18]

As a threshold matter, the FCC determined that it had the authority to reinterpret § 252(i) "because the plain meaning of the section's text gives rise to two different, reasonable interpretations, and because the Supreme Court expressly recognized that the Commission has leeway to reinterpret section 252(i)."[19] In particular, Congress's use of the phrase "upon the same terms and conditions" created ambiguity regarding whether CLECs could adopt individual provisions of existing approved agreements, or whether they had to adopt the entire agreement.[20] An agency has discretion to change its interpretation of an ambiguous statute and is not subject to estoppel for changing its view, the FCC noted.[21]

As to why it believed reinterpretation of § 252(i) was necessary, the FCC observed that, when it first adopted the pick-and-choose rule, it "had no practical experience with the actual mechanics of interconnection agreements" and had "made inaccurate presumptions."[22] However, after "[e]ight years of experience" with the pick-and-choose rule, it was clear to the FCC that the rule impeded negotiations and resulted in "the adoption of largely standardized agreements with little creative bargaining to meet the needs of both the [I]LEC[s] and the [CLECs]."[23] ILECs seldom made significant concessions in negotiations "for fear that third parties [would] obtain equivalent benefits without making any trade-off at all," the FCC explained.[24] Furthermore, CLECs often

[18]*Id.* ¶ 1.

[19]*Id.* ¶ 6.

[20]*Id.* ¶ 7.

[21]*Id.* ¶ 8.

[22]*Id.* ¶ 9.

[23]*Id.* ¶ 12.

[24]*Id.* ¶ 13.

chose to adopt existing approved agreements in their entirety, in contrast to the FCC's initial prediction.[25] Finally, the FCC found that the provision under pick-and-choose allowing an ILEC to require inclusion of "legitimately related" agreement terms "ha[d] become an obstacle to give-and-take negotiations rather than an incentive."[26]

The FCC concluded that, unlike the pick-and-choose rule, "an all-or-nothing rule would better serve the goals of sections 251 and 252 . . . because it would encourage [I]LECs to make trade-offs in negotiations that they [we]re reluctant to accept under the [pick-and-choose] rule."[27] The FCC codified the all-or-nothing rule at 47 C.F.R. § 51.809.[28]

## III.    Discussion

We review the FCC's adoption of the all-or-nothing rule under the two-step framework established in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*[29] First, we must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear," then we "must give effect to the unambiguously expressed intent of Congress."[30] Second, "if the statute is silent or

---

[25]*Id.* ¶ 18.

[26]*Id.* ¶ 17. In particular, the FCC found that "[I]LECs [were] reluctant to engage in give-and-take negotiations even where terms might be legitimately related for fear of having to defend against unreasonable pick-and-choose requests, and requesting carriers [were] denied the benefits of individualized agreements that meet their business needs." *Id.*

[27]*Id.* ¶ 12.

[28]47 C.F.R. § 51.809(a) provides, in part: "An [I]LEC shall make available without unreasonable delay to any requesting telecommunications carrier any agreement in its entirety to which the [I]LEC is a party that is approved by a state commission pursuant to section 252 of the Act, upon the same rates, terms, and conditions as those provided in the agreement."

[29]467 U.S. 837, 842-43 (1984).

[30]*Id.* We review the first step of the *Chevron* analysis de novo. *See id.* at 843 n. 9 ("The judiciary is the final authority on issues of statutory con-

ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."[31]

We also review the FCC's adoption of the all-or-nothing rule for an abuse of discretion under the Administrative Procedure Act ("APA").[32]

A.    *Chevron* Step One: Section 252(i) is Ambiguous

In the first step of the *Chevron* analysis, we determine whether § 252(i) is ambiguous;[33] that is, "whether Congress has directly spoken to the precise question at issue."[34] The issue in this case is whether § 252(i) requires the pick-and-choose rule; that is whether it requires ILECs to make individ-

struction and must reject administrative constructions which are contrary to clear congressional intent."); *Bank of Am., N.A. v. FDIC*, 244 F.3d 1309, 1320 (11th Cir. 2001) (observing that, under *Chevron*, "it is ultimately the function of the judiciary, not the administrative agency, to decide whether Congress spoke directly to the issue in question").

[31]*Chevron*, 467 U.S. at 843.

[32]5 U.S.C. § 706(2)(A) (providing that the reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *see*, *e.g.*, *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, ___ U.S. ___, ___, 125 S. Ct. 2688, 2710 (2005) (reviewing an FCC rule under the APA abuse of discretion standard).

[33]We note that the Supreme Court has not spoken on this issue. We reject the contention, made by some petitioners, that the Supreme Court has already held that § 252(i) is unambiguous and requires the pick-and-choose interpretation. Petitioners rely on the Supreme Court's observation in *AT&T Corp.*, that the pick-and-choose interpretation was "the most readily apparent." 525 U.S. at 396. Had the Court meant that § 252(i) was unambiguous as the petitioners contend, it would have concluded that pick-and-choose was the *only* apparent interpretation, not merely the "most readily apparent." Moreover, the Court would not have gone on to discuss the reasonableness of the FCC's approach. *See id*. Thus, *AT&T Corp.* did not hold that the language of § 252(i) is unambiguous.

[34]*Chevron*, 467 U.S. at 842.

ual provisions of their existing, approved interconnection agreements available to CLECs. We conclude that the statute does not require the rule, it only permits it. Congress simply has not spoken to the precise question before us.

**[1]** Nothing in § 252(i) unambiguously requires an ILEC to make available to CLECs individual agreement provisions. With the disputed phrases in italics, here, again, is the text of § 252(i):

> A local exchange carrier shall make available *any interconnection, service, or network element* provided under an agreement approved under this section to which it is a party to any other requesting telecommunications carrier *upon the same terms and conditions as those provided in the agreement*.

The phrase "any interconnection, service, or network element" indicates that Congress intended to require ILECs to make their services and network elements available to CLECs on an individual, "unbundled" basis.[35] It does not unambiguously require that ILEC make individual *provisions* of existing agreements available to CLECs. The phrase "upon the same terms and conditions as those provided in the agreement" expresses Congress's intent to require ILECs to deal with CLECs on a nondiscriminatory basis,[36] but, again, this phrase does not unambiguously require that ILECs make individual provisions of existing agreements available to CLECs. It could mean that, once an ILEC negotiates an interconnection agreement with a CLEC, the ILEC cannot deny another CLEC access to services and network elements under *all* of the same terms and conditions.

---

[35]*See* 47 U.S.C. § 251(c)(3) (requiring ILECs to provide to any requesting CLEC "access to network elements on an *unbundled* basis at any technically feasible point") (emphasis added).

[36]*See id.* (requiring ILECs to provide to any requesting CLEC "*nondiscriminatory* access to network elements") (emphasis added).

We are not persuaded by the petitioners' arguments that § 252(i) is unambiguous. The petitioners note that § 252(i) requires ILECs to "make available *any* interconnection, service, *or* network element provided under an agreement" (emphases added). They contend that this phrase can only mean that a requesting CLEC can select individual services or network elements in an approved agreement without adopting the entire agreement. But, as we have observed, such a reading is not necessary. An ILEC cannot refuse to provide a CLEC individual services and network elements that it has already agreed to provide in an existing interconnection agreement.[37] However, § 252(i) does not unambiguously specify the terms and conditions under which the ILEC must provide services and network elements. Section 252(i) merely requires ILECs to provide services and network elements "upon the same terms and conditions as those provided in the agreement." The "same terms and conditions as those provided in the agreement" could refer to (1) *particular* terms and conditions in the agreement relating to the service or element requested or (2) the terms and conditions of the entire agreement.[38] The all-or-nothing rule rests on the second interpretation.

Petitioners' argument proves too much. Even under pick-and-choose, CLECs did not have an unlimited ability to pick provisions from existing interconnection agreements. ILECs

---

[37] *See Iowa Utils. Bd.*, 120 F.3d at 800 n.22 (observing that the phrase "any interconnection, service, or network element" "could simply indicate that an incumbent LEC would not be able to shield an individual aspect of a prior agreement from the reach of a subsequent entrant who is willing to accept the terms of the entire agreement").

[38] Thus, we also reject petitioner New Edge Network's contention that the phrase "same terms and conditions as those provided in the agreement" must refer to discrete terms and conditions contained *in* an interconnection agreement, not to the entire agreement. We do not read § 252(i) to require such an interpretation. The "same terms and conditions as those provided in the agreement" could refer to *all* the terms and conditions in the agreement.

could invoke hardship exemptions and time limits**³⁹** and impose terms that were "legitimately related" to the service or network element requested.**⁴⁰** No petitioner argues that the unambiguous language of § 252(i) precludes the "legitimately related" requirement. Once the petitioners concede that the language of § 252(i) does not require unrestricted picking and choosing by CLECs, their argument that the statute's language is unambiguous loses force.

B.   *Chevron* Step Two: All-or-Nothing is a Permissible Construction of § 252(i)

In the second step of the *Chevron* analysis, we ask "whether the agency's [interpretation] is based on a permissible construction of the statute."**⁴¹** "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation."**⁴²**

**[2]** The phrase in § 252(i) specifying that an ILEC shall make available "the same terms and conditions as those provided in the agreement" can reasonably be read to refer to the terms and conditions of the *entire* agreement. Accordingly, we conclude that all-or-nothing is a permissible interpretation of § 252(i).

**[3]** The FCC's construction was also "a reasonable policy choice."**⁴³** The FCC explained that its all-or-nothing rule reflected a "more holistic"**⁴⁴** reading of § 252(i) and that its

---

**³⁹**47 C.F.R. § 51.809(b) and (c) (1996).

**⁴⁰***See* Local Competition Order ¶ 1315.

**⁴¹***Chevron*, 467 U.S. at 843.

**⁴²***Brand X Internet Servs.*, 125 S. Ct. at 2699.

**⁴³***Chevron*, 467 U.S. at 845.

**⁴⁴**Second Report and Order ¶ 7.

initial pick-and-choose rule, in practice, had impeded negotiations.[45] The FCC's explanation satisfies the second step of *Chevron*.[46]

The petitioners' policy arguments to the contrary "create the impression that [they] are now waging in a judicial forum a specific policy battle which they ultimately lost in the agency . . . ."[47] Accordingly, we decline to consider them. "Such policy arguments are more properly addressed to legislators or administrators, not to judges."[48]

### C. The FCC's Adoption of the All-or-Nothing Rule Was Not an Abuse of Discretion

All the petitioners note that, in this case, the FCC has adopted an interpretation that is the opposite of its original interpretation. They cite a pre-*Chevron* case for the proposition that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance."[49] Later Supreme Court cases have recognized, however, that *Chevron* deference still applies to an agency's reversal of position, and we review for abuse of discretion under the APA.[50] We conclude that the record sup-

---

[45]*Id.* ¶¶ 11-12.

[46]*See Chevron*, 467 U.S. at 863.

[47]*Id.* at 864.

[48]*Id.*

[49]*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

[50]*See Brand X Internet Servs.*, 125 S. Ct. at 2699 ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the *Chevron* framework."); *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (An agency's "change [in interpretation] is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency."). *See also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42 ("[Regulatory] agencies do not establish rules of conduct to last forever" and "an agency must be given ample latitude to adapt [its] rules and policies to the demands of changing circumstances.") (citations and quotation marks omitted) (first alternation in original).

ports the FCC's adoption of the all-or-nothing rule and that the agency did not abuse its discretion.

**[4]** ILECs and some state utility commissions submitted comments and affidavits supporting the elimination of pick-and-choose. For example, ILEC BellSouth stated that the pick-and-choose rule was inefficient and impeded negotiation. The Florida Public Service Commission stated that, in its experience arbitrating between ILECs and CLECs, "the negotiation of interconnection agreements has been and is severely hindered by a well-intentioned but outdated regulatory requirement — the 'pick-and-choose' rule." Another ILEC observed that CLECs had "been quite willing to accept entire agreements that others have negotiated." Thus, record evidence supported the FCC's findings that the old pick-and-choose rule impeded negotiations, that invoking pick-and-choose did not lead to efficient interconnection agreement formation, and that, contrary to the FCC's earlier prediction, CLECs were willing to adopt entire agreements.

The petitioners' contention that the FCC did not reasonably exercise its discretion is not persuasive. Petitioner Cox argues that the FCC "relied mainly on speculative, often self-serving statements" by ILECs. We observe, however, that the petitioners' evidence is similarly self-serving. Moreover, not all the evidence in support of all-or-nothing is self-serving; several state utility commissions supported the ILECs' position. Finally, two CLECs supported the ILECs' position; while their statements may well have been self-serving (one would be surprised if they were not), their support of the ILECs' position shows that the FCC's new rule does not simply favor ILECs over CLECs.

Citing *Association of Communications Enterprises v. FCC ("ASCENT")*[51] petitioner CompTel argues that the FCC's adoption of all-or-nothing amounts to an improper forbear-

---

[51]235 F.3d 662 (D.C. Cir. 2001).

ance of pick-and-choose without following the requirements of 47 U.S.C. § 160(a).**⁵²** *ASCENT* does not apply to this case. Here, the FCC is not allowing anyone to avoid a statute or regulation; it has changed its interpretation of a statute and changed the implementing regulation. Pick-and-choose is no longer a statutory requirement. "[Section] 160, prescribing when the Commission may forbear from applying statutory requirements, obviously comes into play only for requirements that exist; it says nothing as to what the statutory requirements are."**⁵³** Accordingly, CompTel's forbearance argument fails.

**[5]** Finally, petitioner Cox's contention that judicial estoppel prevents the FCC from changing its position is unavailing. The doctrine of judicial estoppel prevents a party who has taken a certain position in a legal proceeding, and succeeded in maintaining that position, from taking a contrary position simply because his interests have changed.**⁵⁴** Courts apply the doctrine where a party's "later inconsistent position" presents a "risk of inconsistent court determinations."**⁵⁵** In this case, there is no such risk. Although the FCC argued in *AT & T* Corp. that the language of § 252(i) was unambiguous, the Supreme Court did not adopt that position.**⁵⁶** Thus, the FCC's current position that § 252(i) is ambiguous "introduces no risk of inconsistent court determinations."**⁵⁷** Further, as the FCC

---

**⁵²**47 U.S.C. § 160(a) allows the FCC regulatory flexibility to forbear "from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services" where the FCC determines that enforcement is not necessary to protect consumers or serve the public interest.

**⁵³***U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 579 (D.C. Cir. 2004) (rejecting CLECs' argument that FCC's interpretation of the Act amounted to forbearance and distinguishing *ASCENT*).

**⁵⁴***New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

**⁵⁵** *Id.* at 751 (internal quotation marks omitted).

**⁵⁶***See AT&T Corp.*, 525 U.S. at 396.

**⁵⁷***New Hampshire*, 532 U.S. at 751 (internal quotation marks omitted).

notes, public policy considerations allow the government to change its position in ways that might be inappropriate if merely a matter of private interest.[58] Accordingly, judicial estoppel does not preclude the FCC from changing its interpretation of § 252(i).

## IV.   Conclusion

**[6]** Section 252(i) is ambiguous. Thus, the FCC had authority to reinterpret it. The agency permissibly construed the provision's language in light of its experience when it adopted the all-or-nothing rule. Accordingly we deny the petitions for review.

**PETITIONS DENIED.**

---

[58]*Id*. at 755.