# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATURAL RESOURCES DEFENSE
COUNCIL,
                    *Petitioner,*

            v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,
                    *Respondent.*

No. 06-73217

EPA No.
71 Fed. Reg. 33628

OPINION

Petition for Review of a Final Rule of the
Environmental Protection Agency

Argued and Submitted
October 15, 2007—San Francisco, California

Filed May 23, 2008

Before: Jane R. Roth,* Sidney R. Thomas, and
Consuelo M. Callahan, Circuit Judges

Opinion by Judge Roth;
Dissent by Judge Callahan

---

*The Honorable Jane R. Roth, Senior United States Circuit Judge for
the Third Circuit, sitting by designation.

**COUNSEL**

Sharon Buccino, Aaron Colangelo and Margaret Renner, Natural Resources Defense Council, Washington, D.C., for the petitioner.

David A. Carson, United States Department of Justice, Environmental & Natural Resources Division, Denver, Colorado, for the respondent.

Thomas C. Jackson, Baker Botts L.L.P., Washington, D.C., for amicus curiae American Petroleum Institute.

Janet Lynn McQuaid, Fulbright & Jaworski L.L.P., Austin, Texas, for amicus curiae Independent Petroleum Association of America.

## OPINION

ROTH, Circuit Judge:

The Natural Resources Defense Council (NRDC), along with the Oil and Gas Accountability Project (OGAP), Amigos Bravos, and Powder River Basin Resource Council (Powder River), have challenged aspects of the Environmental Protection Agency's (EPA) recent Clean Water Act (CWA) storm water discharge rule. This rule is entitled "Amendments to the National Pollutant Discharge Elimination System (NPDES) Regulations for Storm Water Discharges Associated With Oil and Gas Exploration, Production, Processing, or Treatment Operations or Transmission Facilities," 71 Fed. Reg. 33,628 (Jun. 12, 2006) (codified at 40 C.F.R. § 122.26).[1] The rule exempts from the permitting requirements of the CWA discharges of sediment from oil and gas construction activities that contribute to violations of water quality standards. Petitioners contend that the rule's NPDES permitting requirement exemption for storm water discharges of sediment from oil and gas construction activities is unlawful under section 402(*l*)(2) of the CWA, 33 U.S.C. § 1342(*l*)(2), as amended by section 323 of the Energy Policy Act of 2005, 33 U.S.C. § 1362(24), and under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). As such, petitioners ask this Court to vacate EPA's rule. For the reasons stated below, we will grant the petition for review, vacate the rule, and remand this matter to EPA for further proceedings in accordance with this opinion.

---

[1] We denied the American Petroleum Institute's motion to intervene, but granted its alternative motion that its submitted brief be treated as an amicus brief.

## I.  BACKGROUND

### A.   1972 Amendments to the CWA

In 1972, Congress amended the CWA, codified at 33 U.S.C. §§ 1251-1387, in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of this goal, the CWA prohibits the "discharge of any pollutant" except in compliance with the CWA's provisions.[2] *Id.* § 1311(a). One such provision is embodied by section 402 of the CWA which establishes the NPDES — a system requiring permits for any discharge of pollutants from a point source. *Id.* § 1342.[3]

### B.   The CWA as Amended by the Water Quality Act of 1987

Recognizing the environmental threat posed by storm water runoff, Congress passed the Water Quality Act of 1987 (WQA). *See* Pub. L. No. 100-4, 101 Stat. 7 (1987) (codified as amended in scattered sections of 33 U.S.C.); *see also* 132 Cong. Rec. 32,381 (1986). The WQA added sections 402(*l*) and (p) to the CWA, setting up a new scheme for regulation of storm water runoff.

Section 402(*l*) exempts certain storm water sources from NPDES permitting. 33 U.S.C. § 1342(*l*). With respect to

---

[2]The "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). A "point source" is "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

[3]The CWA empowers EPA or an authorized State to conduct an NPDES permitting program. 33 U.S.C. § 1342(a)-(b). Under the program, as long as the permit issued contains conditions that implement the requirements of the CWA, the EPA may issue a permit for discharge of any pollutant. 33 U.S.C. § 1342(a)(1).

storm water runoff from oil, gas, and mining operations, section 402(*l*)(2) provides that

> The Administrator *shall not require a permit* under this section, nor shall the Administrator directly or indirectly require any State to require a permit, *for discharges or stormwater runoff* from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, *composed entirely of flows* which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and *which are not contaminated* by contact with, or do not come into contact with, any *overburden, raw material, intermediate products, finished product, byproduct, or waste products* located on the site of such operations.

33 U.S.C. § 1342(*l*)(2) (emphasis added). In administering this exemption, "the EPA Administrator has discretion to determine whether or not storm water runoff at an oil, gas or mining operation is contaminated with . . . overburden, raw material, product, or process wastes . . . ."[4] *NRDC v. EPA*, 966

---

[4]The relevant conference report provides:

The substitute [final version of the bill] provides that permits are not required where stormwater runoff is diverted around mining operations or oil and gas operations and does not come in contact with over burden, raw material, product, or process waste. In addition, where stormwater runoff is not contaminated by contact with such materials, as determined by the Administrator, permits are also not required. With respect to oil or grease or hazardous substances, the determination of whether stormwater is 'contaminated by contact with' such materials, as established by the Administrator, shall take into consideration runoff in excess of reportable quantities under section 311 of the [CWA] or section 102 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or in the case of mining operations, above natural background levels.

F.2d 1292, 1307 (9th Cir. 1992); *see* H.R. Rep. No. 1004, 99th Cong., 2d Sess., at 151.

Section 402(p) of the CWA provides that the EPA or the NPDES States could not require a permit for storm water discharges until October 1, 1992, except for storm water discharges listed under section 402(p)(2).**5** Section 402(p) then establishes two separate phases for the regulation of storm water discharges.**6** 33 U.S.C. § 1342(p).

---

H.R. Rep. No. 1004, 99th Cong., 2d Sess., at 151. The conference report gives the EPA administrator "discretion to determine *when* contamination has occurred with respect to the substances listed in the statute, i.e., over-burden, raw materials, waste products, etc." *NRDC*, 966 F.2d at 1307 (emphasis added). "The conference report states that the Administrator shall take certain factors into account, but the report is clear that the determination of *whether* storm water is contaminated is within the Administrator's discretion." *Id.* (emphasis added).

**5**Section 402(p)(2) provided that a permit must be obtained "with respect to the following stormwater discharges:

(A) A discharge with respect to which a permit has been issued under this section [before February 4, 1987.]

(B) A discharge associated with industrial activity.

(C) A discharge from a municipal separate storm sewer system serving a population of 250,000 or more.

(D) A discharge from a municipal separate storm sewer system serving a population of 100,00 or more but less than 250,000.

(E) A discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States."

33 U.S.C. § 1342(p)(2).

**6**The purpose of the two-phased approach was to allow EPA and the States to focus their attention on the most serious problems first. 133 Cong. Rec. 991 (1987). Phase I, embodied in subsections 402(p)(3) through (4), requires EPA to establish a permit program for certain storm water discharges, including those associated with industrial activity. 33 U.S.C. § 1342(p)(3)-(4). Phase II, embodied in subsections 402(p)(5) through (6), requires EPA to investigate other storm water discharges and to create a comprehensive program to regulate such sources to protect water quality. 33 U.S.C. § 1342(p)(5)-(6).

### 1. Phase I Storm Water Rule

In 1990, EPA issued its NPDES Phase I storm water rule. 55 Fed. Reg. 47,990 (Nov. 16, 1990). This rule established permit requirements for certain storm water discharges, including those discharges associated with construction activities that disturb five acres or greater (large construction sites).

First, at 40 C.F.R. § 122.26(c)(1)(iii), the Phase I rule codified the conditions that would be considered indicative of "contamination" under the CWA section 402(*l*)(2) exemption as follows:

> (iii)  The *operator of an existing or new discharge composed entirely of storm water* from an oil or gas exploration, production, processing, or treatment operation, or transmission facility *is not required to submit a permit application* in accordance with paragraph (c)(1)(i)[7] of this section, *unless the facility*:
>
>> (A)  Has had a discharge of storm water resulting in the discharge of a reportable quantity for which notification is or was required pursuant to 40 CFR 117.21 or 40 CFR 302.6 at anytime since November 16, 1987; or
>>
>> (B)  Has had a discharge of storm water resulting in the discharge of a reportable quantity for which notification is or was required pursuant to 40 CFR 110.6 at any time since November 16, 1987; or
>>
>> (C)  *Contributes to a violation of a water quality standard*.

---

[7]Paragraph (c)(1)(i) applies to "[d]ischargers of storm water associated with industrial activity and with small construction activity."

(emphasis added).[8] Recognizing the "potential for serious water quality impacts," EPA concluded that oil and gas facilities are "likely to discharge storm water runoff that is contaminated" and that "[s]uch contamination can include disturbed soils." 55 Fed. Reg. at 48029. With regard to permit applicability to oil, gas, and mining facilities, EPA explained:

"[These] facilities are among those industrial sites that are *likely to discharge storm water runoff that is contaminated* by process wastes, toxic pollutants, hazardous substances, or oil and grease. *Such contamination can include disturbed soils* and process wastes containing heavy metals or suspended or dissolved solids, salts, surfactants, or solvents used or produced in oil and gas operations. Because they have the *potential for serious water quality impacts*, Congress recognized, throughout the development of the storm water provisions of the Water Quality Act of 1987, the need to control storm water discharges from oil, gas, and mining operations, as well as those associated with other industrial activities . . . . From the standpoint of resource drain on both EPA . . . and potential permit applicants, [Congress's] conclusion was that operators that use good management practices and make expenditures to prevent contamina-

---

[8]Subsequently, in June 2006 when EPA promulgated the final challenged rule, it clarified that the 1990 Phase I rule "codified, at 40 CFR 122.26(c)(1)(iii), the conditions that would be considered indicative of contamination by contact with raw material, intermediate products, finished product, byproduct, or waste products located on a site and would thus necessitate an NPDES storm water permit application by oil and gas exploration, production, processing or treatment operations or transmission facilities." *See* 71 Fed. Reg. at 33629 (June 12, 2006). The CWA does not define the terms "raw material," "intermediate products," "finished product," "byproduct," or "waste products." *See* 33 U.S.C. § 1362. "Overburden" is defined as "any material of any nature, consolidated or unconsolidated, that overlies a mineral deposit, excluding topsoil or similar naturally-occurring surface materials that are not disturbed by mining operations." 55 Fed. Reg. at 58033 (codified at 40 C.F.R. § 122.6(b)(10)).

tion must not be burdened with the requirement to obtain a permit. Hence, section 402(l)(2) creates a statutory exemption from storm water permitting requirements for uncontaminated runoff from these facilities."

55 Fed. Reg. at 48029 (emphasis added).

Thus, EPA's interpretation of 402(*l*)(2) was that "section 402(*l*)(2) creates a statutory exemption from storm water permitting requirements for *uncontaminated* runoff from these facilities," and the Phase I rule merely codified such interpretation. *Id.* (emphasis added).

Second, because the statutory exemption was limited to "operations," EPA determined that all related construction activities were ineligible for the exemption and must apply for a permit in light of the "serious water quality impacts" caused by construction storm water discharges polluted with sediment.[9] 55 Fed. Reg. at 48,033-34. After reviewing the findings of various studies, the EPA provided the underlying rationale for its belief that storm water permits were appropriate for the construction industry:

> Construction activity at a high level of intensity is comparable to other activity that is traditionally

---

[9]EPA concluded that the language in Section 402(*l*)(2) did not justify excluding oil and gas construction from permit requirements that applied to all other types of construction. 71 Fed. Reg. at 33629. A 1992 internal EPA memorandum clarifying EPA's administration of the NPDES permit system confirmed EPA's interpretation of the Phase I rule that "[a]ll construction operations . . . that disturb five or more acres of land are required to apply for a NPDES permit . . . regardless of its affiliation with an oil and gas operation." (ER 001). The oil and gas industry brought suit to challenge this internal memorandum as an unauthorized promulgation of oil and gas permit regulations that contradicted the exemption at 33 U.S.C. § 1342(*l*)(2), but the suit was dismissed for lack of subject matter jurisdiction. *Appalachian Energy Grp. v. U.S. EPA*, 33 F.3d 319, 322 (4th Cir. 1994).

viewed as industrial, such as natural resource extraction. Construction that disturbs large tracks of land will involve the use of heavy equipment such as bulldozers, cranes, and dump trucks. Construction activity frequently employs dynamite and/or other equipment to eliminate trees, bedrock, rockwork, and to fill or level land. Such activities also engage in installation of haul roads, drainage systems, and holding ponds that are typical of the industrial activity identified in § 122.26(b)(14)(i-x). EPA cannot reasonably place such activity in the same category as light commercial or retail business.

Further, the runoff generated while construction activities are occurring has potential for serious water quality impacts and reflects an activity that is industrial in nature. Where construction activities are intensive, the localized impacts of water quality may be severe because of high unit loads of pollutants, primarily sediments. Construction sites can also generate other pollutants such as phosphorus and nitrogen from fertilizer, pesticides, petroleum products, construction chemicals and solid wastes. These materials can be toxic to aquatic organisms and degrade water for drinking and water-contact recreation. Sediment runoff rates from construction sites are typically 10 to 20 times that of agricultural lands, with runoff rates as high as 100 times that of agricultural lands, and typically 1,000 to 2,000 times that of forest lands. Even small construction sites may have a significant negative impact on water quality in localized areas. Over a short period of time, construction sites can contribute more sediment to streams than was previously deposited over several decades.

EPA is convinced that because of the impacts of construction discharges that are directly to waters of

the United States, such discharges should be addressed by permits issued by Federal or NPDES State permitting authorities. It is evident from numerous studies and reports submitted under section 319 of the CWA that discharges from construction sites continue to be a major source of water quality problems and water quality standard violations. Accordingly EPA is compelled to address these source[s] under these regulations and thereby regulate these sources under a nationally consistent program with an appropriate level of enforcement and oversight.

55 Fed. Reg. at 48033-34.

## 2. Phase II Storm Water Rule

In 1999, EPA issued the Phase II storm water rule, thereby expanding the NPDES storm water program to address storm water discharges from construction sites that disturb one to five acres (small construction sites). 64 Fed. Reg. 68,722 (Dec. 8, 1999). Under this rule, small construction sites were required to obtain an NPDES permit by March 10, 2003. 64 Fed. Reg. at 68,840 (codified at 40 C.F.R. § 122.26(e)(8)); *see* 71 Fed. Reg. at 33,629. Noting various studies that had taken place both prior and subsequent to the issuance of the Phase I rule, EPA reiterated its concern over sediment-laden storm water discharges from construction activities on water quality impact. 64 Fed. Reg. at 68,728-30. EPA justified extending the NPDES permit requirements to small construction activities as follows:

EPA believes that the water quality impact from small construction sites is as high as or higher than the impact from larger sites on a per acre basis. The concentration of pollutants in the runoff from smaller sites is similar to the concentrations in the runoff from larger sites. The proportion of sediment that

makes it from the construction site to surface waters is likely the same for larger and smaller construction sites in urban areas because the runoff from either site is usually delivered directly to the storm drain network where there is no opportunity for the sediment to be filtered out.

64 Fed. Reg. at 68,730.

### 3.   Deferral Rules

In 2002, EPA determined that close to 30,000 oil and gas sites, annually, could be affected by the Phase II rule.[10] 67 Fed. Reg. 79,828 (Dec. 30, 2002). In order to take this new information into account, EPA published a final rule postponing, until March 10, 2005, the NPDES permit authorization deadline for storm water discharges from small construction activity associated with oil and gas sites.[11] 68 Fed. Reg. 11,325 (Mar. 10, 2003). EPA again postponed the permit deadline for an additional 15 months until June 12, 2006.[12] 70 Fed. Reg. 11,560 (Mar. 9, 2005).

---

[10]Initially, EPA assumed that few of these sites would incur compliance costs associated with the Phase II rule because most of them would be less than one acre. However, based on new information, EPA believed that a significant number of such sites may exceed one acre. In addition, EPA had assumed that the oil and gas industry would use best management practices (BMPs) similar to those in other industrial sectors involved in construction and development, if affected. EPA planned to gather more data on the BMPs used by the oil and gas industry to determine if its estimated costs range for BMPs was accurate. 67 Fed. Reg. at 79,829-30.

[11]EPA issued this deferral rule to further evaluate the economic impact of the permit requirements on the oil and gas industry, the appropriate BMPs that might be used to prevent contamination of storm water runoff associated with oil and gas operations, and the scope and effect of the CWA section 402(*l*)(2) exemption and other storm water provisions. 67 Fed. Reg. at 79,828.

[12]EPA's preliminary analysis indicated that there could be substantial economic impact associated with the regulation of oil and gas sites, pri-

## C. The CWA as Amended by the Energy Policy Act of 2005

Prior to the NPDES permit deadline, Congress addressed the issue of permit requirements for storm water discharges from oil and gas construction sites in the Energy Policy Act of 2005, which was signed into law on August 8, 2005. Section 323 of the Energy Policy Act amended section 503 of the CWA to include the following revised definition:

> (24)   Oil and gas exploration and production:
>
> The term "oil and gas exploration, production, processing, or treatment operations or transmission facilities" means all field activities or operations associated with exploration, production, processing, or treatment operations, or transmission facilities, including activities necessary to prepare a site for drilling and for the movement and placement of drilling equipment, *whether or not such field activities or operations may be considered to be construction activities*.

Pub. L. No. 109-58, § 323, 119 Stat. 694 (codified as amended at 33 U.S.C. § 1362(24)) (emphasis added). In this manner, the Energy Policy Act amended the CWA by defining "oil and gas exploration, production, processing, or treatment operations, or transmission facilities" to specifically include related construction activities, thereby bringing such activities within the CWA section 402(*l*)(2) exemption from

---

marily due to delays in the permitting process resulting in lost production, that it had not yet taken into account. 71 Fed. Reg. at 33,630. EPA therefore further postponed the NPDES deadline by 15 months for small construction sites associated with oil and gas operations in order to complete its economic impact, legal, and procedural analyses and continue to evaluate practices and methods operators may employ to control storm water discharges. 70 Fed. Reg. 11,560.

the NPDES permitting requirement. It is important to note that, in addition to the newly amended definitional section 503(24), the term "oil and gas exploration, production, processing, or treatment operations or transmission facilities" appears in only one other place in the CWA — in section 402(*l*)(2). 33 U.S.C. § 1342(*l*)(2). The Energy Policy Act amendment of the definition did not, however, change the statutory language of section 402(*l*)(2).

### 1. Notice of Proposed Rulemaking

In January 2006, EPA gave notice of proposed rulemaking that would modify EPA's NPDES storm water permit regulations to reflect the Energy Policy Act's change to the definition of oil and gas operations and facilities and the related impact on section 402(*l*)(2).[13] 71 Fed. Reg. 894, 897 (Jan. 6, 2006). Based on its interpretation of section 402(*l*)(2), as amended by the Energy Policy Act, EPA proposed to clarify in 40 C.F.R. § 122.26(a)(2)(ii) that a "water quality standard violation for sediment alone does not trigger a permitting requirement." 71 Fed. Reg. at 898. EPA explained that it had initially codified its interpretation of section 402(*l*)(2)'s phrase "contaminated by contact with" at § 122.26(c)(1)(iii) by providing that oil and gas operations were exempt from permit requirements except where their discharges (1) contribute reportable quantities of oil, grease, or hazardous substances to waters of the United States or (2) contributed to a violation of a water quality standard. 71 Fed. Reg. at 897-98. However, upon reexamination of the *unchanged* statutory text of section 402(*l*)(2) of the CWA, EPA determined that "a plain reading of [that section] suggests that oil and gas sites where runoff is not contaminated by contact with raw mate-

---

[13]A second stated purpose for the proposed rulemaking was "to encourage voluntary application of best management practices (BMPs) for oil and gas field activities and operations, including construction, to provide additional protection of water quality from potential storm discharges." 71 Fed. Reg. at 897.

rial, intermediate products, finished product, byproduct or waste products located at the site are not required to obtain NPDES permits, even in situations where the runoff might be contributing to a violation of water quality standards (the term overburden is applicable only to mining)." 71 Fed. Reg. at 898. EPA stated that when it promulgated the Phase I rule (codified at 40 C.F.R. § 122.26(c)(1)(iii)) in 1990, it "believed it reasonable to presume that causing or contributing to a violation of water quality standards was an indication of contamination as envisioned under the statute." 71 Fed. Reg. at 898. EPA explained, however, that "now that Congress has explicitly extended the exemption to construction activities associated with oil and gas operations, EPA believes this presumption may no longer be valid in some instances." 71 Fed. Reg. at 898.

## 2. The Challenged Final Rule

In June 2006, EPA promulgated the challenged final rule — entitled "Amendments to the National Pollutant Discharge Elimination System (NPDES) Regulations for Storm Water Discharges Associated With Oil and Gas Exploration, Production, Processing, or Treatment Operations or Transmission Facilities"—codifying changes to the CWA resulting from the Energy Policy Act of 2005. 71 Fed. Reg. 33,628 (codified at 40 C.F.R. § 122.26(a)(2)(ii)). The final rule added the following provision:

> (2) The Director may not require a permit for discharges of storm water runoff from the following:
>
> . . .
>
> (ii) All field activities or operations associated with oil and gas exploration, production, processing, or treatment operations or transmission facilities, including activities necessary to prepare a site for drilling and for the movement and placement of

> drilling equipment, whether or not such field activi-
> ties or operations may be considered to be construc-
> tion activities, except in accordance with paragraph
> (c)(1)(iii) of this section. *Discharges of sediment*
> *from construction activities associated with oil and*
> *gas exploration, production, processing, or treat-*
> *ment operations or transmission facilities are not*
> *subject to the provisions of paragraph (c)(1)(iii)(C)*
> *of this section.*

40 C.F.R. § 122.26(a)(2)(ii) (emphasis added). Thus, pursuant
to this rule, EPA cannot require permits for storm water dis-
charges comprised solely of sediment from oil and gas con-
struction activities, even if such discharges contribute to a
violation of a water quality standard.

As it had done in its notice of proposed rulemaking, EPA
provided its rationale for its new interpretation of section
402(*l*)(2) of the CWA to specifically exclude from NPDES
permitting requirements sediment-laden storm water dis-
charges from construction activities. Noting that the Energy
Policy Act amendment to the CWA does not specifically
address sediment, EPA nevertheless reasoned that sediment,
being the "pollutant most commonly associated with con-
struction activity," is the "very pollutant being exempted from
permitting by the Energy Policy Act of 2005." 71 Fed. Reg.
at 33630-31, 33,634. EPA further explained that "discharges
of sediment . . . do not necessarily indicate contamination
through contact with raw material, intermediate products, fin-
ished product, byproduct, or waste products." 71 Fed. Reg. at
33631. Accordingly, EPA claimed that "exempting storm
water discharges of sediment from oil and gas construction
sites from NPDES permitting requirements reflects a reason-
able (and EPA believes, the best) interpretation of Congres-
sional intent in limiting the 402(*l*)(2) exemption to discharges
not contaminated by contact with raw material, intermediate
products, finished product, byproduct, or waste products." 71
Fed. Reg. at 33634.

## II. PROCEDURAL POSTURE & ISSUES PRESENTED

On June 23, 2006, NRDC petitioned this Court for direct review of EPA's action pursuant to 33 U.S.C. § 1369(b)(1) and Federal Rule of Appellate Procedure 15. Amigos Bravos, the Powder River, and OGAP were subsequently joined as petitioners, having timely filed their motions to intervene. On appeal, NRDC and the other petitioners contend that EPA's final rule and regulation, which exempts from NPDES permitting the runoff of sediment-laden storm water from oil and gas construction activities, contravenes Congressional intent and constitutes an impermissible interpretation of section 402(*l*)(2) of the CWA, as amended by the Energy Policy Act of 2005.

EPA claims that the practical effect of the amended statutory language is to exempt from NPDES permitting requirements the sediment-laden storm water runoff from construction activities and that EPA merely codified, at 40 C.F.R. § 122.26(a)(2)(ii), Congress's unambiguous intent to specifically exclude such discharges from NPDES permitting requirements. Alternatively, EPA argues that even if Congressional intent on the issue is not clearly ascertainable, EPA's interpretation of the statute that it administers is nonetheless reasonable and permissible. EPA asserts that it has no discretion to require a permit when storm water runoff is contaminated solely by sediment from oil and gas related construction activities because (1) sediment is the pollutant most closely associated with construction activities, and (2) Congress has prohibited EPA from requiring an NPDES storm water permit for discharges from construction activities at oil and gas sites unless the discharge is contaminated by at least one of a specific list of materials that does not include sediment. EPA does, however, concede that *prior* to the 2005 amendment to the CWA, if an oil and gas facility discharged storm water runoff contaminated *only* with sediment resulting in a water quality violation, that facility did not meet the conditions for

permit exemption under 402(*l*)(2) and, thus, was required to apply for a permit.

## III. JURISDICTION

We have jurisdiction to review this petition pursuant to the CWA, 33 U.S.C. § 1369(b)(1)(F). *See NRDC v. EPA*, 966 F.2d 1292, 1296-97 (9th Cir. 1992) (recognizing that Section 1369(b)(1)(F) authorizes appellate review of EPA rules governing underlying permit procedures).

## IV. STANDING

Any "interested person" may seek review of designated actions of the EPA Administrator. 33 U.S.C. § 1369(b)(1). The "injury-in-fact" rule for standing, as articulated in *Sierra Club v. Morton*, 405 U.S. 727 (1972), is applicable here. *Trustees for Alaska v. EPA*, 749 F.2d 549, 554 (9th Cir. 1984). Under this rule, a petitioner must suffer adverse affects to his or her economic interests or "[a]esthetic and environmental well-being." *Sierra Club*, 405 U.S. at 734. Furthermore, "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members of the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). NRDC, Amigos Bravos, and Powder River have demonstrated, to this Court's satisfaction, association standing under the broad standing requirement applicable here. *See Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1994) (explaining that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others).

## V. STANDARD OF REVIEW

We review EPA's final storm water rule under the Administrative Procedure Act (APA), codified at 5 U.S.C. §§ 701-

06. *See American Mining Congress v. U.S. E.P.A.*, 965 F.2d 759, 763 (9th Cir. 1992). Under the APA, this Court is authorized to "set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

In reviewing EPA's interpretation of a statute that it administers, we follow the two step approach set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-44 (1984). *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1163 (9th Cir. 1999); *see also Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1452 (9th Cir. 1996). At the first step, we use "traditional tools of statutory construction" to determine whether Congress has unambiguously expressed its intent on the issue before the court. *Chevron*, 467 U.S. at 843 n. 9. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, if a statute is "silent or ambiguous with respect to a specific issue," we move on to step two where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Congress may leave an explicit gap, thereby expressly delegating legislative authority to the agency subject to the arbitrary and capricious standard. *Id.* at 843-44. If legislative delegation is implicit, we must defer to an agency's statutory interpretation so long as it is reasonable. *Id.* at 844. As a component of whether an agency's interpretation is permissible, we will take into account the consistency of the agency's position over time.

*See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (explaining that "the consistency of an agency's position is a factor in assessing the weight that position is due"); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 447 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)).

## VI.   DISCUSSION

### A.   *Chevron* Step One: Congressional Intent

[1] Because this case presents an issue of an agency's statutory interpretation, *Chevron* applies. First, then, we must determine whether Congress, when it amended section 503(24) of the CWA, through section 323 of the Energy Policy Act, unambiguously intended to exempt from NPDES permitting requirements for oil and gas construction activities the discharge of storm water runoff contaminated solely with sediment. An examination of the statutory language and its legislative history assists us in this inquiry. *See Defenders of Wildlife*, 191 F.3d at 1164-65; *see also American Mining Congress*, 965 F.2d at 764-65.

Section 402(*l*)(2) of the CWA provides as follows:

> The Administrator shall not require a permit under this section, nor shall the Administrator directly or indirectly require any State to require a permit, for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing, or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation

runoff and *which are not contaminated by contact with, or do not come into contact with, any overburden, raw material, intermediate products, finished product, byproduct, or waste products* located on the site of such operations.

33 U.S.C. § 1342(*l*)(2) (emphasis added).

Section 323 of the Energy Policy Act affected section 402(*l*)(2) of the CWA by adding construction activities to the definition of oil and gas exploration and production operations or facilities:

(24)   Oil and gas exploration and production:

The term "*oil and gas exploration, production, processing, or treatment operations or transmission facilities*" means all field activities or operations associated with exploration, production, processing, or treatment operations, or transmission facilities, including activities necessary to prepare a site for drilling and for the movement and placement of drilling equipment, *whether or not such field activities or operations may be considered to be construction activities*.

Pub. L. No. 109-58, § 323, 119 Stat. 694 (codified as amended at 33 U.S.C. § 1362(24)) (emphasis added).

[2] The plain language of section 402(*l*)(2) of the CWA, as affected by the Energy Policy Act, does not indicate whether or not Congress intended that the NPDES permit exemption cover storm water discharges contaminated solely with sediment. Neither CWA section 402(*l*)(2) nor section 323 of the Energy Policy Act of 2005 mention the term "sediment." The statutory language of section 402(*l*)(2) merely indicates that oil and gas operations or facilities, which now include construction activities, are exempt from NPDES permitting

requirements *so long as* the storm water runoff from those activities is not contaminated with, or does not come in contact with, certain statutorily *undefined* contaminants: overburden, raw material, intermediate products, finished product, byproduct, or waste products.[14] Furthermore, even if we were to accept NRDC's argument that sediment can be construed as a "waste product," that term is still ambiguous in the context of gas and oil related construction activities. There is no single, plain meaning for this term.[15]

[3] Nor does the limited legislative history of CWA section 402(*l*)(2), both prior to and as amended by section 323 of the Energy Policy Act, indicate that Congress unambiguously intended to exempt (or not exempt) from NPDES permitting requirements discharges of storm water runoff contaminated solely with "sediment." NRDC contends that, in passing section 402(*l*)(2) in 1987, Congress merely intended to avoid unnecessary administrative burdens without allowing any pollution. *See* 133 Cong. Rec. H168-03 (Jan. 8, 1987) (Section 402(*l*)(2) aims to avoid "unnecessary paperwork restrictions"

---

[14]The CWA does not define the terms "raw material," "intermediate products," "finished product," "byproduct," or "waste products." *See* 33 U.S.C. § 1362. "Overburden" has been defined by EPA as "any material of any nature, consolidated or unconsolidated, that overlies a mineral deposit, excluding topsoil or similar naturally-occurring surface materials that are not disturbed by mining operations." 40 C.F.R. § 122.26(b)(10).

[15]NRDC relies on *N. Plains Res. Council v. Fidelity Exploration & Dev. Co.*, 325 F.3d 1155 (9th Cir. 2003) to support its argument that sediment is a "waste product" under section 402(*l*)(2) of the CWA. In *Northern Plains*, we held that the unaltered but "salty" groundwater produced in association with methane gas extraction and discharged into the river is a pollutant within the meaning of the CWA. *Id.* at 1163. We found that the "salty" groundwater is a "pollutant" under the CWA because it is "industrial waste." *Id.* at 1160. In particular, we defined "waste" as "any useless or worthless byproduct of a process or the like; refuse or excess material." *Id.* at 1161 (quoting American Heritage Dictionary (1979)). Accordingly, NRDC argues that sediment is essentially a useless or worthless byproduct of construction activities and is a contaminant—namely "waste product" — for purposes of the § 402(*l*)(2) permit exemption.

while still keeping environmental protection "at a premium") (statement of Rep. Hammerschmidt); 131 Cong. Rec. E3476-02 (July 22, 1985) ("[A]ny stormwater which has come into contact with any potential pollutant would not be eligible for the stormwater runoff exemption.") (statement of Sen. Breaux).

On the other hand, EPA asserts that the most relevant legislative history is that of the Energy Policy Act of 2005 because it was through that legislation that Congress enacted the amendment to the CWA that EPA codified in the final rule challenged here. EPA notes that several members of Congress indicated their intention to vote against the Energy Policy Act of 2005 in part because it exempted storm water discharges from oil and gas construction activities from regulation under the CWA. EPA suggests that such opposition confirms that Congress intended to exempt storm water discharges from oil and gas related construction activities, regardless of sediment's impact on water quality. 151 Cong. Rec. S9262 (daily ed. July 28, 2005) (remarks of Sen. Kerry); *id.* at S9342 (daily ed. July 29, 2005) (remarks of Sen. Feinstein); *id.* at S9346 (remarks of Sen. Clinton); *id.* at S9346-47 (remarks of Sen. Jeffords ); *id.* at E1726 (remarks of Rep. Udall). EPA relies specifically on comments made by Senator Jeffords where he explained that storm water discharges typically contain "pollutants such as oil and grease, chemicals, nutrients, metals, bacteria, and particulates"—which EPA claims is synonymous with sediment—and that the amendment would roll back the then-existing requirement that construction activities larger than five acres at oil and gas sites must obtain NPDES permits. 151 Cong. Rec. S9347 (daily ed. July 29, 2005).

**[4]** EPA's multiple citations to the remarks of senators opposed to the Energy Policy Act are particularly unavailing. In the hierarchy of legislative history sources, statements by opponents are among the least authoritative, as they are meant to defeat the bill in question and do not "represent the considered and collective understanding of those Congressmen"

who passed the bill into law. *Zuber v. Allan*, 396 U.S. 168, 186 (1969). Accordingly, using standard tools of statutory construction, we can not conclude that Congress, when it amended section 402(*l*)(2) of the CWA to expand the NPDES permitting exemption to construction activities, vis-a-vis Section 323 of the Energy Policy Act, unambiguously intended to exempt from NPDES permitting requirements discharges of storm water runoff contaminated solely with sediment. Because we conclude that Congress was silent on the issue, we move to *Chevron* step two.

## B. *Chevron* **Step Two: Permissibility of Statutory Interpretation**

**[5]** At *Chevron* step two, we must determine whether EPA's interpretation is permissible. We need not find that EPA's interpretation is the *only* permissible construction of amended section 402(*l*)(2) or even the reading this Court would have reached, but only that EPA's interpretation is not arbitrary and capricious. *See Chevron*, 467 U.S. at 843, n.11. To determine whether the EPA's interpretation of section 402(*l*)(2) of the CWA, as amended by the Energy Policy Act, is permissible, "we look to the plain and sensible meaning of the statute, the statutory provision in the context of the whole statute and case law, and to the legislative purpose and intent." *Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1022 (9th Cir. 2005). Additionally, we will take into account the *consistency* of the agency's position over time. *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 447 n.30 (1987); *see also Watt v. Alaska*, 451 U.S. 259, 273 (1981).

An administrative agency is "not estopped from changing a view [it] believes to have been grounded upon a mistaken legal interpretation." *Good Samaritan Hosp.*, 508 U.S. at 417 (citations omitted). In particular, an agency "is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not

approach the statutory construction issue *de novo* and without regard to the administrative understanding of the statutes." *Id.* (quoting *NLRB v. Iron Workers*, 434 U.S. 335, 351 (1978)). "On the other hand, the consistency of an agency's position is a factor in assessing the weight that position is due." *Id.* As the Supreme Court has stated: "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Cardoza-Fonseca*, 408 U.S. at 447 n.30 (quoting *Watt*, 451 U.S. at 273).

EPA interpreted section 402(*l*)(2) of the CWA, as amended by the Energy Policy Act, to provide that a "water quality standard violation for sediment alone does not trigger a permitting requirement." 71 Fed. Reg. at 898. EPA justified the challenged final rule, *see* 71 Fed. Reg. 33628, and regulation, *see* 40 C.F.R. § 122.26(a)(2)(ii), as follows:

> [N]ow that Congress has broadened the 402(*l*)(2) exemption to include construction activities at oil and gas field operations, EPA believes that discharges of sediment are not necessarily indicative of such contact [with raw material, intermediate products, finished product, byproduct or waste products]. Sediment is the pollutant most commonly associated with construction activity. Hence, exempting storm water discharges of sediment from oil and gas construction sites from NPDES permitting requirements reflects a reasonable (and EPA believes, the best) interpretation of Congressional intent in limiting the 402(*l*)(2) exemption to discharges not contaminated by contact with raw material, intermediate products, finished product, byproduct or waste products, in the context of the new definition for oil and gas exploration, production, processing or treatment operations or transmission facilities included in the Energy Policy Act of 2005.

71 Fed. Reg. at 33634; *see also* 40 C.F.R. § 122.26(a)(2)(ii) ("Discharges of sediment from construction activities associated with oil and gas exploration, production, processing, or treatment operations or transmission facilities are not subject to the provisions of paragraph (c)(1)(iii)(C) of this section."); *see also* 40 C.F.R. § 122.26(c)(1)(iii)(C) ("The operator of an existing or new discharge composed entirely of storm water from an oil or gas exploration, production, processing, or treatment operation, or transmission facility is not required to submit a permit application in accordance with paragraph (c)(1)(i)[16] of this section, unless the facility . . . [c]ontributes to a violation of a water quality standard").

[6] Thus, EPA argues that, because "sediment is the pollutant most commonly associated with construction activities," Congress must have meant to exempt all construction-related sediment when it made construction activities eligible for the exemption, or else the amendment would be effectively meaningless. *See* 71 Fed. Reg. at 33634. We conclude, however, that EPA's interpretation of the CWA section 402(*l*)(2), as amended by the Energy Policy Act, is arbitrary and capricious because of the agency's changed position on *what* constitutes "contamination" under that section. *See Good Samaritan Hosp.*, 508 U.S. 402, 417 (1993); *see also Cardoza-Fonseca*, 480 U.S. 421, 447 n.30 (1987); *see also Watt*, 451 U.S. 259, 273 (1981)).

[7] EPA concedes that, prior to the Energy Policy Act amendment to the CWA, if a gas and oil facility discharged storm water runoff contaminated *only* with sediment resulting in a water quality violation, that facility did not meet the conditions for permit exemption under 402(*l*)(2) and thus was required to apply for a permit. *See also* 40 C.F.R. § 122.26(c)(1)(iii)(C) (1990) (requiring permits for discharges from oil and gas activities that contribute to a violation of a water

---

[16]Paragraph (c)(1)(i) applies to "[d]ischargers of storm water associated with industrial activity and with small construction activity."

quality standard). During oral argument before this Court, EPA admitted that, before the 2005 amendment, a permit was required for discharge of sediment-laden runoff resulting in a water quality violation even if such runoff was otherwise uncontaminated. Therefore, EPA had previously recognized that oil and gas exploration, production, processing or treatment operations or transmission facilities had an obligation to apply for an NPDES permit for storm water runoff contaminated only with sediment.

[8] Now, EPA has changed its interpretation of what constitutes "contamination" under section 402(*l*)(2) based exclusively on a legislative amendment that does not mention (1) sediment or (2) EPA's long-standing position that discharges of storm water runoff from oil and gas activities, contaminated solely with sediment *and* which contribute to a violation of a water quality standard, require a NPDES permit. In order to minimize and justify its earlier stance, EPA first argues that its previous NPDES permit requirement for such discharges was merely a "rule of administrative convenience" because it assumed that runoff contaminated solely with sediment was *likely* contaminated with overburden, raw material, intermediate products, finished product, byproduct, or waste products. EPA also argues that it never previously considered, until the 2005 amendment, how sediment alone should be treated under existing regulations.

We find EPA's arguments to be unpersuasive in light of EPA's own statements during its rule-making process prior to the passage of the Energy Policy Act of 2005. *See* 55 Fed. Reg. at 48033-34; *see also* 64 Fed. Reg. at 68,728-30. EPA long recognized that oil and gas construction sites were prime candidates for NPDES permitting in light of what EPA referred to as "serious water quality impacts" caused by construction storm water discharges polluted with sediment. 55 Fed. Reg. at 48,033 34. For example, as we have set out above, in its Phase I storm water rule, EPA stated that construction activities are "industrial in nature;" that "localized

impacts of water quality may be severe because of high unit loads of pollutants, primarily sediments;" that "[s]ediment runoff rates from construction sites are typically 10 to 20 times that of agricultural lands . . . with runoff rates as high as 100 times that of agricultural lands, and typically 1,000 to 2,000 times that of forest lands;" that "[e]ven small construction sites may have a significant negative impact on water quality in localized areas;" that "[o]ver a short period of time, construction sites can contribute more sediment to streams than was previously deposited over several decades;" that "[i]t is evident from numerous studies and reports submitted under . . . the CWA that discharges from construction sites continue to be a major source of water quality problems and water quality standard violations;" and that "EPA is compelled to . . . regulate these sources." *Id.* Moreover, after considering additional environmental studies and reports that had been submitted subsequent to the Phase I storm water rule, EPA reiterated in the Phase II rule its concerns about the impact on water quality of sediment-laden storm water discharges from construction activities. *See* 64 Fed. Reg. at 68,728-30. Furthermore, in its notice of proposed rulemaking in January 2006, EPA stated that, when it promulgated the Phase I rule in 1990, it "believed it reasonable to presume that causing or contributing to a violation of water quality standards was an indication of contamination as envisioned under the statute." 71 Fed. Reg. at 898.

**[9]** In light of EPA's prior statements, it can hardly be said that EPA's previous stance was merely a "rule of administrative convenience" or that EPA never considered how sediment alone should be treated prior to the Energy Policy Act of 2005. Clearly, EPA's June 12, 2006, storm water discharge rule, codified at 40 C.F.R. § 122.26, represents a complete departure from its previous interpretation of what constitutes "contamination" under section 402(*l*)(2). As such, we conclude that EPA's inconsistent and conflicting position regarding the discharge of sediment-laden storm water from oil and gas construction sites causes its interpretation of amended

section 402(*l*)(2), as reflected in the storm water discharge rule, 40 C.F.R. § 122.26, to be an arbitrary and capricious one. *See Good Samaritan Hosp.*, 508 U.S. at 417; *see also Cardoza-Fonseca*, 480 U.S. at 447 n.30; *see also Watt*, 451 U.S. at 273. This conclusion is reinforced by the fact that neither the amending statute (section 323), the statutory definition (section 503(24)), nor the statutory exemption (402(*l*)(2)) make any mention at all of "sediment" — or of whether it is covered or not.

Based on the foregoing, we hold that the promulgated rule, including the corresponding regulation, is arbitrary and capricious and constitutes an impermissible construction of 402(*l*)(2) of the CWA. Accordingly, we **VACATE** the rule, and **REMAND THIS MATTER FOR FURTHER PROCEEDINGS** consistent with this opinion.

**GRANT PETITION FOR REVIEW, VACATE RULE AND REMAND FOR FURTHER PROCEEDINGS.**

---

CALLAHAN, Circuit Judge, dissenting:

I agree with the majority that at step one of the analysis under *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), the plain language of section 402(*l*)(2) of the Clean Water Act ("section 402(*l*)(2)"), 33 U.S.C. § 1342(*l*)(2), as amended by the Energy Policy Act of 2005, does not unambiguously indicate whether Congress intended the exemption from National Pollutant Discharge Elimination System ("NPDES") permitting to cover storm water discharges contaminated solely with sediment. I further agree that the scant legislative histories for section 402(*l*)(2) and the relevant portions of the Energy Policy Act do not elucidate Congress's clear intent. Therefore, as the majority correctly concludes, this dispute must be resolved at step two of the *Chevron* analysis, with the question of whether the Environ-

mental Protection Agency ("EPA") provided *a*—not the *only* or the *best*—permissible interpretation of section 402(*l*)(2). It is at this point that I respectfully part course with the majority and accord EPA's permissible interpretation appropriate deference.

The majority opinion holds that "EPA's interpretation of the [Clean Water Act] section 402(*l*)(2), as amended by the Energy Policy Act, is arbitrary and capricious because of the agency's changed position on *what* constitutes 'contamination' under that section." Maj. Opinion at 5974 (emphasis in original). The main thrust of its reasoning is that before enactment of the Energy Policy Act, EPA required that an oil and gas facility that discharged storm water runoff contaminated only with sediment and resulting in a water quality violation apply for a NPDES permit. After enactment of the Energy Policy Act, EPA's storm water rule exempts such dischargers from seeking a permit. Therefore, the majority concludes that EPA's "inconsistent and conflicting position regarding the discharge of sediment-laden storm water from oil and gas construction sites" renders its interpretation of section 402(*l*)(2) arbitrary and capricious. Maj. Opinion at 5976.

The Supreme Court has recognized that "the mere fact that an agency interpretation contradicts a prior agency position is not fatal." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996). In fact, the seminal decision in this context, *Chevron,* itself accorded deference to EPA's revised interpretation of statutory language. 467 U.S. at 863-64. For this reason, the Court "has rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question." *Rust v. Sullivan*, 500 U.S. 173, 186 (1991) (quoting *Chevron*, 467 U.S. at 862). "An initial agency interpretation is not instantly carved in stone." *Chevron*, 467 U.S. at 863. Nor should it be, because "an agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Id.* at 863-64.

Courts will accord *Chevron* deference to an agency's revised interpretation of a statute if the agency justifies that revision with "reasoned analysis." *Rust*, 500 U.S. at 187; *see Nat. Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981, 1001 (2005) (stating that the agency "is free within the limits of reasoned interpretation to change course if it adequately justifies the change"); *see also Smiley*, 517 U.S. at 742 (noting that *Chevron* deference is warranted despite a change in position so long as the agency avoids the "pitfalls" of a "[s]udden and unexplained change," or "change that does not take account of legitimate reliance on prior interpretations"); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (stating that "where the agency's interpretation of a statute is at least as plausible as competing ones, there is little, if any, reason not to defer to its construction"); *New Edge Network, Inc. v. FCC*, 461 F.3d 1105, 1112-13 (9th Cir. 2006) (rejecting an argument that "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance"). Acknowledging language from *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987), that an agency's statutory interpretation that conflicts with an earlier interpretation is entitled to "considerably less deference," this court has still held that "an agency's 'new' position is entitled to deference 'so long as the agency acknowledges and explains the departure from its prior views.' " *Resident Council of Wash. v. Leavitt*, 500 F.3d 1025, 1036 (9th Cir. 2007) (quoting *Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1346 (9th Cir. 1990)).

Here, EPA provided a reasoned analysis that adequately explains its revised interpretation of section 402(*l*)(2). Congress enacted section 402(*l*)(2) to exempt from NPDES permitting storm water runoff from oil and gas activities—namely, oil and gas exploration, production, processing, or treatment operations or transmission facilities—unless that runoff was contaminated by, or came into contact with, statutorily enumerated substances consisting of "raw material,

intermediate product, finished product, byproduct, or waste products located on the site." Prior to passage of the Energy Policy Act, EPA treated all oil and gas construction activities as falling outside this exemption. 71 Fed. Reg. 33,628, 33,629-33,630 (June 12, 2006). The Energy Policy Act made oil and gas construction activities eligible for exemption under section 402(*l*)(2), however, which then required EPA to conduct a fresh analysis of how construction activities relate to the permit exemption. *See id.* at 33,631.

Although EPA noted that the Energy Policy Act did not specifically mention sediment, it reasoned that "that pollutant naturally falls within the newly created exemption from NPDES permitting." 71 Fed. Reg. at 33,630-33,631. The agency determined that "[t]he presence of sediment in a discharge from a construction site is not itself indicative of contact with" the materials listed in the exemption provision (*i.e.*, raw materials, intermediate product, final product, byproduct, and waste products). *Id.* at 33,631. EPA further stated that sediment is the pollutant most commonly associated with construction activities. *Id.* (citing 69 Fed. Reg. 22,475 (Apr. 26, 2004), and 67 Fed. Reg. 42,654 (June 24, 2004)). As an example of the association of sediment discharge and construction, EPA pointed to its 2003 construction general permit, which focused "primarily on limiting discharges of sediment." *Id.* It concluded that it would be inconsistent with the Energy Policy Act's amendments to the Clean Water Act to codify a permit exemption for oil and gas construction activities but not to exempt discharges of sediment, the pollutant most commonly associated with construction. *Id.* Once Congress included construction activities within the exemption, EPA promulgated the rule at issue here based on what it perceived to be Congress's intent.

Additionally, EPA had signaled before passage of the Energy Policy Act that it had not committed to a rigid position regarding sediment discharges related to oil and gas construction activities. EPA indicated during the two "deferral"

periods that it intended to further consider the effect of its regulations on the oil and gas industry, that it needed to further consider the effect of the section 402(*l*)(2) exemption on other Clean Water Act provisions, and that it still needed to determine the "appropriate NPDES requirements, if any, for small construction of oil and gas exploration and production facilities." 68 Fed. Reg. 11,325, 11,326, 11,328 (Mar. 10, 2003); 71 Fed. Reg. at 33,629-33,630. The Clean Water Act authorized EPA to consider all of these factors in creating a comprehensive NPDES permit system. *See* 33 U.S.C. § 1342(p)(5), (6). Under these circumstances, EPA made a reasonable policy choice within its authority, and, therefore, the court should defer to that choice. *See Brand X Internet Servs.*, 545 U.S. at 986 (citing *Chevron*, at 467 U.S. at 845).

The majority opinion contends that EPA's explanation is weakened by the fact that the Energy Policy Act does not mention the word "sediment," and that EPA had taken a "long-standing position that discharges of storm water runoff from oil and gas activities, contaminated with sediment *and* which contribute to a violation of a water quality standard, require a NPDES permit." Maj. Opinion at 5975 (emphasis in original.) First, there appears to be no authority that would compel EPA to stay its hand until Congress specifically amended the ambiguous exemption at section 402(*l*)(2) to include the word "sediment." Second, the mere fact that EPA revisited the exemption after passage of the Energy Policy Act does not render the results of its analysis arbitrary. *See Brand X Internet Servs.*, 545 U.S. at 1001-02 (finding that the FCC's "fresh analysis" of its treatment of cable providers in light of changed market conditions was not arbitrary). In *Chevron*, the Supreme Court took no issue with the fact that EPA had promulgated a rule after a new administration "initiated a 'Government-wide reexamination of regulatory burdens and complexities.' " *See* 467 U.S. at 857 (quoting 46 Fed. Reg. 16,281). In *Rust*, the Court found that the Secretary of Health and Human Services permissibly revised the agency's interpretation of a statute in order to provide clear and

operational guidance to recipients of government family planning grants consistent with the original intent of the statute. 500 U.S. at 179, 187. In *New Edge Network*, this court deferred to an agency's revised interpretation of an ambiguous statutory provision where the revision was prompted by review of the practical function and results of the previous interpretation. 461 F.3d at 1109. Here, EPA acted within its authority to revisit its interpretation of section 402(*l*)(2). Not only was EPA's interpretation in flux at the time it promulgated the storm water discharge rule, but it was guided by its interpretation of Congress's intent in the Energy Policy Act to provide greater exemptions with regard to the discharge of sediment from oil and gas construction activities. Therefore, because EPA's "interpretation is at least as plausible as competing ones," this court should defer to its construction. *Good Samaritan Hosp.*, 508 U.S. at 417.

Accordingly, I respectfully dissent and would deny the petition.